UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                               :
JONATHAN BORGOS-HANSEN         :
                               :
v.                             :    CIV. NO. 3:13CV1857 (HBF)
                               :
CAROLYN W. COLVIN,             :
COMMISSIONER, SOCIAL SECURITY  :
ADMINISTRATION                 :
                               :
```

RECOMMENDED RULING ON CROSS MOTIONS

This action was filed under § 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. § 1383(c)(3), to review a final decision of the Commissioner of Social Security ("the Commissioner"), denying plaintiff's claim for child's insurance benefits based on disability ("CIB") and supplemental security income ("SSI"). Plaintiff Jonathan Borgos-Hansen moves for an order reversing or remanding the decision of the Commissioner [Doc. #20], while the Commissioner moves to affirm. [Doc. #23]. For the reasons that follow, plaintiff's motion to reverse or, in the alternative, remand [**Doc. #20**] is **DENIED**. Defendant's Motion to Affirm [**Doc. #23**] is **GRANTED**.

## I.   LEGAL STANDARD

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must decide whether the determination is supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).

1

Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. In reviewing an ALJ's decision, the court considers the entire administrative record. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is to ensure that a claim has been fairly evaluated. Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have h[is] disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987)(citation and quotation marks omitted). To enable a reviewing court to decide whether the determination is supported

2

by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984). Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. <u>Peoples v. Shalala</u>, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. Nov. 4, 1994); <u>see generally</u> <u>Ferraris</u>, 728 F.2d at 587.

## II.  ADMINISTRATIVE PROCEEDINGS

The parties do not dispute this matter's procedural history. Plaintiff filed concurrent applications for CIB and SSI on January 22, 2010, alleging disability beginning January 20, 2006.[1] (Certified Transcript of the Record, compiled on January 13, 2014 (hereinafter "Tr.") Tr. 205-215). Both applications were initially denied on March 25, 2010 (Tr. 99-105), and on reconsideration on June 16, 2010. (Tr. 106-16). Plaintiff then

---

[1] The record also reflects plaintiff's April 20, 2007 applications for CIB (Tr. 58, 199-204) and SSI, which were denied on June 11, 2007 (Tr. 59, 96-98). Other records indicate that the initial applications were denied as a result of plaintiff's mother providing insufficient evidence and that the mother wanted to withdraw the claim because plaintiff "was doing better." (Tr. 63; 274).

3

requested a hearing before an Administrative Law Judge (Tr. 117-18), which the SSA acknowledged via letter dated August 20, 2010 (Tr. 119-125).  On January 3, 2012, Administrative Law Judge ("ALJ") James E. Thomas held a hearing at which plaintiff, represented by an attorney, appeared. (Tr. 27-35, 153-61, 166-70). The hearing was continued in light of Attorney Spat's then recent appearance in the case and missing medical records. (Tr. 27-35). Plaintiff testified at the continued hearing on May 31, 2012. (Tr. 36-57, 173-87, 191-98). On June 28, 2012, the ALJ issued an unfavorable decision. (Tr. 9-26). On October 16, 2013, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's June 28, 2012 decision the final decision of the Commissioner. (Tr. 1-8).  Plaintiff filed this timely action for review of the Commissioner's decision.

III.      **SUBSTANTIVE EVIDENCE**

   A.  *Hearing Testimony*[2]

   At the time of the hearing, plaintiff was twenty-one (21) years old. (Tr. 39).  He has a twelfth grade education. (Tr. 39). Plaintiff testified that he received special accommodations at school; specifically he was permitted to use the elevator and was provided an extra set of books so that he did not have to carry them between home and school. (Tr. 41-42). Although

---

[2] As noted above, plaintiff, represented by counsel, initially appeared at a hearing before ALJ Thomas on January 3, 2012. (Tr. 27-35). At this hearing, Attorney Spat advised ALJ Thomas that the record was incomplete. (Tr. 29). During the hearing the ALJ asked plaintiff about various medical providers and his treatment, to which plaintiff could not adequately respond on account of his "horrible memory." (Tr. 30-33). ALJ Thomas "reluctantly" postponed the hearing so that plaintiff could submit additional medical records. (Tr. 34).

plaintiff graduated from high school, he had to go to summer
school because he had difficulty understanding and missed
classes due to his condition. (Tr. 42). Plaintiff had a
difficult time concentrating due to headaches and stomach aches;
he also had trouble remembering things. (Tr. 42-43).

Plaintiff testified he does not have a driver's license,
"[m]ainly because I can't work, so I don't have money, so I
can't really buy a car or even pay for a driver's license." (Tr.
43). After further questioning from his attorney, he then
explained that he has "problems that [his] leg muscles get
stiff, and [he does not] want to be responsible for someone
else's life because [his] leg got cramped up and [he] cant (sic)
move [his] foot out of the accelerator." (Tr. 43).

Plaintiff also testified that he experienced various
difficulties in his activities of daily living.  For example,
although he will help with some household chores, like sweeping,
laundry and washing dishes, it takes him a long time to complete
these tasks due to back pain and a need to take breaks. (Tr. 43-
44, 53). Plaintiff will typically lay down for most of the day,
about five hours. (Tr. 44). He testified that pain keeps him up
at night and it is hard for him to have a good night's rest.
(Tr. 44).  Plaintiff also testified that he has joint pain every
day, which, "sometimes it can be tingling, it can be a sharp
pain, or it can be pounding pain in [his] shoulders, or [his]
elbows, or anywhere." (Tr. 45). He is never pain free. (Tr. 45).

Plaintiff testified that he is able to walk a city block "at his own pace," which is pretty slow. (Tr. 47). Plaintiff is unable to complete the family shopping alone. (Tr. 48). When he does complete the shopping, he experiences leg, arm, shoulder, and lower back pain. (Tr. 48). Plaintiff also experiences pain in his hands, wrists and arms "three times every week," which affects his ability to type or play video games. (Tr. 48-49). He testified that his hands cramp and swell (Tr. 49), but that he doesn't really have problems dropping things. (Tr. 52-53). Plaintiff has difficulty getting dressed due to pain in his low back and shoulders. (Tr. 53).

Plaintiff also testified that he experiences headaches, which bother him for "most of the day." (Tr. 49). He is sensitive to light and will retreat to a dark room when experiencing the headaches. (Tr. 50). Plaintiff also has kidney problems and high blood pressure. (Tr. 50). He testified that the high blood pressure affects his headaches, which typically last the entire day. (Tr. 50). He also experiences intermittent lower back pain. (Tr. 51). Plaintiff testified that he experiences side-effects from his medication CellCept, including stomach aches and diarrhea. (Tr. 51). Since his admission to St. Mary's Hospital in Waterbury, for a pulmonary embolism, plaintiff experiences difficulty breathing. (Tr. 45-46). Plaintiff is now taking Coumadin, and has his blood drawn every week to check his Coumadin levels. (Tr. 46). At the time of the

hearing, plaintiff was also taking prednisone. (Tr. 46).

Plaintiff testified that he has "zero friends and [he does not] go out" because he has no energy or money. (Tr. 54). For entertainment plaintiff watches TV and plays videogames. (Tr. 55). Plaintiff also said that even if he could hold a job, he believed he could only work one or two days per week. (Tr. 56; 171-72, 188-89).[3]

### B.   *Activities of Daily Living reports*

#### 1.   **Report dated January 31, 2010 (Tr. 287-94)**

Plaintiff completed an Activities of Daily Living Report dated January 31, 2010. (Tr. 285-92). Plaintiff lives in an apartment with family, performs chores two times a week for as long as he can, and then watches television. (Tr. 287). Prior to his illnesses/conditions, plaintiff states, he was able to "do thing[s] a lot faster and longer, like help friends, sports, and more chores." (Tr. 288). Plaintiff also reports that pain sometimes keeps him from sleeping for one to three hours. (Tr. 288). Now, it takes him more time to wash his hair because his arms start to hurt. (Tr. 288). Plaintiff lists numerous daily medications, including prednisone, plaquenil, enalapril, tramadol, and naproxen. (Tr. 289). Plaintiff prepares his own meals on a monthly basis. (Tr. 289). He also performs chores, such as cleaning a half bathroom (twice per week for thirty minutes), his laundry (one time per month), and ironing.

---

[3] The ALJ did not elicit testimony from Vocational Expert Courtney Olds. (Tr. 56).

Plaintiff is able to use public transportation. (Tr. 290). He does not shop or spend time with others. (Tr. 291-92).

He also reports that his illnesses/conditions affect his ability to lift, squat, bend, stand, walk, sit, climb stairs, memory, completing tasks, get along with others, understand, follow instructions, concentrate and use his hands. (Tr. 292). Plaintiff further elaborates that, "Before I could lift 100 pounds[,] now I can only lift 20 pound[s] and only for a short time, and I forget thing[s] sometimes." (Tr. 292).

## 2.    Report dated May 10, 2010 (Tr. 305-12)

Plaintiff completed an activities of daily living report dated May 10, 2010. (Tr. 305-12). Unless otherwise noted, much of the May 2010 report is substantively similar to the January 2010 report. Since the January 31, 2010 report, plaintiff reports that he "can't get up from bed to eat something," (Tr. 306), but he is able to prepare "food" two times a day, and "meals" weekly. (Tr. 307). He also reports taking additional medications, including hydroxychloroquine and lansoprazole. (Tr. 307). Plaintiff states he cannot go out alone because he needs help walking or has dizziness, (Tr. 308), and that he shops for groceries every four months. (Tr. 309). Plaintiff further notes that, "If I am lifting something cant (sic) be more than 40 to 50 pounds but I can only lifted for 5 minutes at most." (sic) (Tr. 310). Plaintiff states he does not know how far he can walk without stopping because he doesn't walk "to[o] much." (Tr.

311). He also reports difficulty following written and spoken instructions. (Tr. 311).

### C.   Medical Evidence

Plaintiff alleges he is disabled on account of a number of physical impairments. A summary of the relevant medical evidence of record follows.

### 1.   Connecticut Children's Medical Center ("CCMC")

Plaintiff received his first dose of IV Cytoxan on February 13, 2006. (Tr. 359). He was seen two days later by Dr. Kathleen Sardegna, a nephrologist with CCMC. (Tr. 359-60). Dr. Sardegna notes that, "A renal biopsy performed last week revealed diffuse proliferative glomerulonephritis type IV secondary to his lupus. This puts him at high risk for progression to renal failure[…]" (Tr. 359); see also Tr. 356-57 (biopsy results). Plaintiff's urinalysis was "Large for blood, 3+ protein." (Tr. 359); see also Tr. 361 (urinalysis results). Dr. Sardegna also expressed concern for plaintiff's "massive weight gain on prednisone." (Tr. 360). Plaintiff was admitted to CCMC on February 20, 2006, and was discharged eight days later with the diagnoses of Lupus, diffuse proliferative glomerulonephritis[4], and reversible

---

[4] "A term used to describe a distinct histologic form of glomerulonephritis common to various types of systemic inflammatory diseases, including [] systemic lupus erythematosus[…]" http://emedicine.medscape.com/article/239646-overview (date last visited: January 6, 2015). "Glomerulonephritis [] is inflammation of the tiny filters in your kidneys (glomeruli). Glomeruli remove excess fluid, electrolytes and waste from your bloodstream and pass them into your urine." http://www.mayoclinic.org/diseases-conditions/glomerulonephritis/basics/definition/con-20024691 (date last visited: January 6, 2015).

posterior leukoencephalopathy[5]. (Tr. 340). His admission followed
three tonic-colonic seizures at home. (Tr. 340). Upon admission,
he was intubated for one day and had a head CT scan, which was
consistent with reversible posterior leukoencephalopathy. (Tr.
340-41). He was then transferred to the pediatric ICU. (Tr.
340). His blood pressure was high and "erratic." (Tr. 340-41).
Plaintiff's condition stabilized on day four, and he was
transferred "to the floor." (Tr. 341). Over the next three days,
his "blood pressure continued to be labile and high," but "[h]e
otherwise remained stable on his regular lupus medications."
(TR. 341-42). On discharge, plaintiff was instructed to maintain
a low-sodium and low-fat diet, regularly check his blood
pressure, and avoid contact sports. (Tr. 342).

　　　Plaintiff next saw Dr. Sardegna on March 6, 2006, was doing
"much better" and, per Dr. Sardegna, had "never looked better."
(Tr. 362-63). At this time, the VNA was visiting plaintiff at
home and reported his "good compliance with medications." (Tr.
362). Plaintiff's hypertension was "much improved," and his
Dilantin was decreased in light of his stable blood pressure.
(Tr. 362-63). Plaintiff saw Dr. Barbara Edelheit, a pediatric
rheumatologist with CCMC, on April 10, 2006. (Tr. 348-49).
Plaintiff complained of some pain in his shoulders, hips and
elbows, but denied joint pain, morning stiffness, or limited

---

[5] "Reversible posterior leukoencephalopathy is a syndrome of headache,
seizures and visual loss, often associated with an abrupt increase in blood
pressure." http://www.nzbri.org/research/publications/papers/0609.pdf (date
last visited: January 6, 2015).

range of motion. (Tr. 348). His physical examination was unremarkable and showed full range of motion. (Tr. 348). Cytoxan caused plaintiff nausea and vomiting, and his kidney disease "remains quite active." (Tr. 348-49). On this date, he also saw Dr. Sardegna for a follow-up of his nephritis and hypertension and reported doing well with no complaints of headaches. (Tr. 365-66). Plaintiff's weight "continued to climb" and his urinalysis showed large for blood, 2+ for protein, and visible red blood cell casts. (Tr. 365); see also Tr. 367 (urinalysis results). His blood pressure was "excellent." (Tr. 365). Although plaintiff tolerated his Cytoxan dose during the last month, he required hospitalization overnight due to vomiting. (Tr. 366).

Plaintiff saw Dr. Sardegna for nearly monthly follow-ups from May 8, 2006 through January 24, 2007. (Tr. 369-74; 377-92). Treatment records for these visits generally reflect plaintiff's well controlled or stabilized hypertension (Tr. 369, 372, 378-79, 382, 386, 388, 390); Dr. Sardegna's observations that plaintiff is generally doing well (Tr. 369, 382, 386); some improvement in his blood work and urinalysis results (Tr. 369, 372, 377, 382, 385-86, 390)[6]; and intermittent complaints of

---

[6] Plaintiff's December 11, 2006 blood work returned normal, except for low lymphocyte levels and high granulocyte levels. (Tr. 355-56). Plaintiff's renal panel reflected high levels of carbon dioxide, phosphorus, and double strand DNA Ab, EIA. (Tr. 355-56). Plaintiff's January 24, 2007 blood work returned normal, except for low white blood cell and lymphocyte levels. (Tr. 353-54). His renal panel was also normal. (Tr. 353-54). Blood work obtained on November 16, 2007 revealed low levels of white blood cells and calcium, and positive ANA screen. (Tr. 579-80).

joint and other pain, some of which was relieved by Naprosyn (Tr. 369, 372, 379, 382, 385, 388) [7]. In July 2006, plaintiff started to show some signs of steroid toxicity. (Tr. 377). He was also transitioned from IV Cytoxan to CellCept on July 14, 2006, with which he reported no problems. (Tr. 378-79). A musculoskeletal exam performed in July 2006 further revealed full range of motion with no swelling. (Tr. 376). In November 2006, Dr. Sardegna noted plaintiff still had some elements of active nephritis. (Tr. 385). Dr. Sardegna's January 24, 2007 treatment note reflects that Dr. Edelheit saw plaintiff for problems with headaches, as well as difficulty with concentrating and memory loss. (Tr. 390). A brain MRI returned normal, and Dr. Edelheit referred plaintiff for neuropsychiatric testing for evidence of lupus cerebritis. (Tr. 390). Dr. Sardegna further records that, "Other than the headaches, which sound constant and sometimes incapacitating, [plaintiff] denies any other pains. He specifically denies abdominal, hip pain or joint pain. (Tr. 390).

Plaintiff saw Dr. Sardegna several times between March and December 2008. (Tr. 600-01, 604-08). He also saw Dr. Edelheit. (Tr. 598-99). Treatment notes for these visits generally reflect that plaintiff is doing well, despite his complaints of fatigue and diffuse body pain. (Tr. 598-601, 604, 606). Physical exams

---

[7] A treatment note dated July 14, 2006, notes plaintiff complained of increased joint pain since starting work picking up trash (Tr. 377). Plaintiff finished this summer job, which involved a fair amount of walking. (Tr. 379); see also Tr. 375-76 (Dr. Edelheit's July 31, 2006 treatment note stating that plaintiff occasionally has some myalgias, but that both plaintiff and his mother attributed them to his summer job).

were normal, and Drs. Sardegna and Edelheit were pleased with plaintiff's lupus control, noting that his labs were largely normal and he appeared to be "stable" and in "relative remission." (Tr. 598-601, 604); see also Tr. 566-68; 576-78 (lab results for the applicable time period, which are largely normal). It is also noted that plaintiff was taking the majority of his medications. (Tr. 606).

### 2.   Child Adolescent Health Care (Tr. 399-411; 471-77)

Treatment notes from this provider date from October 25, 2006 to November 30, 2010. (Tr. 399-411; 471-77). There are documented complaints of gastrointestinal distress (Tr. 404-06), as well as joint and other pain throughout this portion of the record (Tr. 402-04, 406, 471). On May 26, 2009, plaintiff additionally reported suffering from headaches and blurry vision. (Tr. 406). Blood work collected on this date reflected elevated creatinine levels. (Tr. 409). A urinalysis showed elevated protein levels and trace blood. (Tr. 410). A urinalysis conducted on September 11, 2009, revealed a small amount of blood in plaintiff's urine, but was otherwise normal. (Tr. 407). A treatment note from November 30, 2010, indicates that, "[plaintiff] states that he stopped taking any medication for about two months because he was still experiencing pain when taking it and that [illegible] making him groggy and want to be fully alert and energetic when working." (Tr. 471). Blood tests

from this date are largely normal, except for high levels of ALT[8] and "indeterminate" amount of DNA Ab Double Stranded Levels. (Tr. 477). A urinalysis reflected high levels of protein and microalbumin. (Tr. 475).

### 3. Rheumatology Associates of Greater Waterbury – Drs. Adriana Blanco & Beatrice Memet[9]

Plaintiff first presented to Dr. Adriana Blanco on December 15, 2008, for a rheumatology consultation at the referral of Dr. Edelheit. (Tr. 422-25). Plaintiff's physical examination was unremarkable and he generally showed full range of motion without pain or tenderness. (Tr. 424-25). Dr. Blanco notes that, "The source of his pain is unclear; he does not have arthritis or synovitis by exam. He has mechanical low back and hip pain. His hand pain is of unclear etiology." (Tr. 425). He continued to see Dr. Blanco through 2009. (Tr. 427-35). Examination results during this time were largely unremarkable. (Tr. 427-35). He reported continuing pain. (Tr. 430). Plaintiff's mother expressed concern that his pain regimen was not helping, but declined stronger medications. (Tr. 427). Dr. Blanco expressed concern regarding plaintiff's absences at school and future prospects. (Tr. 427, 431). Laboratory test results for 2009 are also largely unremarkable, although plaintiff did have a small amount of blood in his urine. (Tr. 557-565).

---

[8] Test typically used to detect liver injury. http://labtestsonline.org/understanding/analytes/alt/tab/test/ (date last visited: January 6, 2015).

[9] Rheumatology Associates changed names in 2011 to "Alliance Medical Group." (Tr. 688).

14

In 2010, Plaintiff continued to receive follow-up treatment
with Dr. Beatrice Memet at Rheumatology Associates of Greater
Waterbury. (Tr. 436-51). In February 2010, plaintiff complained
of diffuse muscle pain and chronic joint pain. (Tr. 436). On
examination, he had normal muscle strength in both upper and
lower extremities, tenderness with palpation over the superior
aspect of both trapezius muscle, and mild palpation of the
lumbar paravertebral muscle area. (Tr. 438). Dr. Memet concluded
that plaintiff's musculoskeletal complaints could be attributed
to secondary fibromyalgia. (Tr. 439). Physical examination
results were similarly unremarkable in March 2010 (Tr. 441),
although plaintiff continued to experience "on and off" pain in
his knees and lower back. (Tr. 440). Despite these complaints,
Dr. Memet observed that plaintiff "overall is doing well with no
joint swelling or significant stiffness." (Tr. 440). Dr. Memet
expressed concern for possible secondary fibromyalgia in the
setting of chronic musculoskeletal complaints. (Tr. 442).
Plaintiff's other visits to Dr. Memet in 2010 revealed that he
was doing well despite complaints of intermittent skeletal aches
and pains. (Tr. 503, 506). Musculoskeletal examinations were
also unremarkable and generally revealed full range of motion
without pain. (Tr. 504, 507).[10] Again, Dr. Memet attributed
plaintiff's complaints of chronic pain to likely secondary
fibromyalgia. (Tr. 504, 508, 512). In May 2010, there was no

---

[10] The November 2010 examination revealed diffuse symmetric tender points, but
no evidence of synovitis or joint swelling. (Tr. 511).

15

evidence of active kidney disease. (Tr. 504). In August 2010,
plaintiff's mother advised Dr. Memet that plaintiff was missing
three to four days of medication every other week due to upset
stomach and diarrhea. (Tr. 506). In November, when plaintiff
admitted stopping his medications, including the Cellcept and
plaquenil (Tr. 510, 512), Dr. Memet discussed the risks of
discontinuing his medications (Tr. 512). Plaintiff also advised
that he was applying for jobs and was fearful of losing his
Title 19 insurance. (Tr. 510). As of November 2010, previous
blood tests revealed no active lupus activity. (Tr. 512). Blood
work and urinalysis for 2010 revealed high levels of lymph, ALT
and adolase, positive DNA Ab Double Strand results and blood and
protein in plaintiff's urine. (Tr. 443-51; 513-18); but see Tr.
503 (May 3, 2010 treatment note indicating that plaintiff's
"[m]ost recent blood test at the end of March revealed normal
cell counts, kidney function, liver function tests, as well as
urinalysis that failed to reveal significant proteinuria or
active sediment."); Tr. 506 (August 2, 2010 treatment note
indicating that plaintiff's "[r]ecent blood test in June is
unremarkable. Previous urinalysis revealed stable
proteinuria."); Tr. 632 (January 13, 2011 treatment note
indicating that plaintiff's November 2010 blood tests "revealed
stable normal kidney function, normal complemet level, stable
low double dsDNA[] and more active urinary desiment with
moderate blood and increased protein.").

16

Dr. Memet continued to monitor plaintiff throughout 2011. (Tr. 632-41). In January 2011, plaintiff reported restarting his medications, which he had discontinued in November. (Tr. 632, 637); see also Tr. 640 ("Poor medical compliance with immunosuppressive therapy as CellCept has been causing diarrhea."). As of April 2011, plaintiff reported better, but not complete, compliance with his medications (Tr. 638) and, as of September 2011, stated he was taking his medications "religiously" (Tr. 699); but see Tr. 697 (Treatment note from August 2011 stating, "There is a history of poor medical compliance with immunosuppressive therapy. He states he is able to tolerate CellCept now despite intermittent diarrhea. Pulmonary embolism likely related to APLA's and primary hypercoagulable state and noncompliance with his medications."); Tr. 699 (September 2011 treatment note stating that, "[plaintiff] has lupus with Class 4 lupus nephritis and recent pulmonary embolism in the setting of positive antiphopholipid anitbodies and worsening proteinuria due to non-compliance with medications."). Treatment records from 2011 generally reflect plaintiff "doing well," despite complaints of diffuse body pain. (Tr. 632, 637-38, 640, 699, 703, 707, 851).[11] Musculoskeletal exams revealed some diffuse tender points, but no evidence of muscle weakness in the upper or lower extremities and no joint

---

[11] Early 2011 treatment records also reflect that plaintiff was contemplating or seeking employment. (Tr. 633, 639).

swelling. (Tr. 636, 640, 697, 700, 705).[12] Plaintiff also
complained of fatigue and diarrhea. (Tr. 639, 696, 700, 704,
707, 708, 851). In light his pulmonary embolism, Dr. Memet noted
in August 2011 that plaintiff would need lifelong
anticoagulation with Wafarin. (Tr. 697). By December 2011,
plaintiff was complaining of worsening chronic/diffuse pain and
experienced diffuse symmetric tender points in the anterior
chest, trapezius, instrascapular and gluteal area bilaterally.
(Tr. 707, 709).  January 2011 blood tests "revealed stable serum
double-stranded DNA, protein, creatinine urine ratio [] with
moderate blood and a few RBCs. Stable serum [] C3 and mildly
elevated ALT." (Tr. 638); see also Tr. 656-63 (January 2011
blood work and urinalysis results); Tr. 663-74 (similar April
2011 blood work and urinalysis results). In August 2011,
"[l]upus serologies revealed a positive double stranded DNA on
the lower side, stable kidney function and worsening
proteinuria." (Tr. 699); see also Tr. 809-17 (August 2011 blood
test and urinalysis results). September tests "reveal[ed] active
urinary sediment but stable kidney function". (Tr. 704).[13]
November blood tests similarly showed stable low double stranded

---

[12] The Court notes a September 2011 lumbar spinal examination revealing
"discomfort with anterior flexion. There is tenderness to palpation over the
left side paravertebral muscle column. There is positive straight leg raising
test on the left side at 45 degrees. There is no weakness of the hip flexor,
leg extensors[…]" (Tr. 701). Dr. Memet ordered a lumbar MRI to evaluate for
herniated disc and radiculitis. (Tr. 702). The MRI only revealed a minor
broad central bulge without stenosis at L5-S1. (Tr. 703); see also Tr. 720-21
(September 2011 MRI results). In October 2011, Dr. Memet noted that
plaintiff's chronic lower and upper back pain is "likely related to
myofascial pain syndrome." (Tr. 705-06).

[13] A September 2011 renal ultrasound and Doppler returned normal. (Tr. 722).

DNA and low C4, along with stable kidney function and a decrease
in the urinary protein/creatinine ratio. (Tr. 707); see also Tr.
711-19 (November 2011 blood test and urinalysis results).
December blood work returned normal. (Tr. 818-19).

### 4.   Dr. Memet Medical Source Statement & Interrogatories (Tr. 865-76)

Dr. Memet completed twenty-two interrogatories supplied by
Attorney Spat about the plaintiff and his fibromyalgia. (Tr.
865). The majority of the questions are answered in the
affirmative including, by way of example, the following:

> 1.    Has patient had widespread pain in all four quadrants
>       of the body for a minimum of three months?
> 2.    Does patient exhibit widespread pain?
> 3.    Does patient suffer from fatigue secondary to FMS?
> 4.    Are patient's complaints consistent with clinical
>       findings?
> 5.    Is pain a significant factor in functional loss?

(Tr. 856).

Dr. Memet also completed a medical source statement dated
February 3, 2012. (Tr. 866). She opined plaintiff cannot lift or
carry any weight, but did not identify any medical or clinical
findings supporting this limitation. (Tr. 866). She further
opined that plaintiff could continuously sit for three hours,
stand for less than one hour and walk for one hour. (Tr. 867).
In an eight-hour workday, plaintiff can sit for three hours
total and, stand and walk for a total of two hours. (Tr. 867).
Dr. Memet also opined that plaintiff can occasionally reach and
handle with both hands, but can never finger, feel, push/pull,
or operate foot pedals. (Tr. 868). Dr. Memet further found that

plaintiff has full postural limitations, in that he can never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch or crawl. (Tr. 869). She also opined that plaintiff has total environmental limitations and can never be exposed to unprotected heights, vibrations, extreme heat and cold, and pulmonary irritants, among others. (Tr. 869). Dr. Memet also notes that plaintiff can shop, walk a block and climb a few steps at a reasonable pace, and sort/handle files, but with pain. (Tr. 870). With respect to each of the aforementioned findings, Dr. Memet affirmatively notes that medical or clinical findings supporting these assessments are contained in her medical records. (Tr. 867-70). Finally, Dr. Memet concludes by stating that chronic pain is produced by plaintiff's condition(s); plaintiff's sleep is routinely disrupted from pain; plaintiff experiences chronic fatigue; fatigue, weakness or pain are significant factors in functional loss; pain interferes with sustaining concentration and attention throughout eight hours; persistence and pace are impaired; plaintiff experiences side effects from his medications; pain and fatigue contribute to anxiety and depression; and that loss of function interferes with plaintiff's activities. (Tr. 871).

Finally, Dr. Memet also completed a questionnaire dated February 3, 2012, that is tailored to Listings 14.09 (inflammatory arthritis) and 14.02 (Lupus). (Tr. 872-76). She opined that plaintiff's condition has been documented by his

20

medical history, clinical findings and examinations, selected laboratory studies, and plaintiff's responses to treatment, therapy and/or medications. (Tr. 872). She also stated plaintiff has a history of joint pain, swelling and tenderness (Tr. 872), and that his impairment has joint involvement and various muscle involvement. (Tr. 874). Dr. Memet further notes that plaintiff has significant documented constitutional symptoms of fatigue and malaise. (Tr. 875); see also Tr. 876 (affirmatively answering that plaintiff exhibits repeated manifestations of Lupus and two or more constitutional symptoms or signs). She also states there is kidney involvement. (Tr. 875). Finally, Dr. Memet noted that during a flare of his condition, plaintiff has experienced marked limitation of activities of daily living, maintaining social functioning, and timely completing tasks due to deficiencies in concentration, persistence or pace. (Tr. 876).

### 5. Associated Specialists in Nephrology and Hypertension – Dr. Anthony J. Cusano

Dr. Anthony J. Cusano saw plaintiff for a renal consult on February 12 and June 4, 2009. (Tr. 528-31). Treatment notes for these visits include the diagnoses of CKD[14] stage 1; hypertension; mild hematuria; and proteinuria negative for one year. (Tr. 259). Dr. Cusano notes in February that plaintiff is "[d]oing very well [with] lupus activity [remainder of sentence

---

[14] Acronym for chronic kidney disease.
http://www.ncbi.nlm.nih.gov/books/NBK84563/ (date last visited: January 7, 2015).

illegible]." (Tr. 529, 531). In June, Dr. Cusano also notes that plaintiff was going outside to exercise and to play baseball and basketball with his brother. (Tr. 531). Dr. Cusano next saw plaintiff on September 11, 2009, for a renal consult. (Tr. 416). Blood work and a urinalysis performed ten days prior returned normal (Tr. 417-19), but a urinalysis from September 11 revealed small amounts of blood in plaintiff's urine. (Tr. 420-21). Plaintiff saw Dr. Cusano for renal consults on March 16 and September 21, 2010. (Tr. 452-53, 479-80). Treatment notes for these visits record a diagnosis of CKD Stage 1 and lupus nephritis. (Tr. 453, 480). Dr. Cusano's March treatment note appears to state that, "pt doing well [with] proteinurea and all likely minimal if any nephritis @ present." (Tr. 453). Dr. Cusano's September treatment note reflects plaintiff losing weight with diet and exercise. (Tr. 480).  He also notes that, "Pt [and] mother concerned about stopping meds – we discussed pt's desire to work but loss of insurance if he does – they cannot afford meds if he does[…]" (Tr. 480).

Dr. Cusano next saw plaintiff on March 24, 2011, on referral from Dr. Memet. (Tr. 520). The treatment note for this visit indicates that plaintiff's CKD and creatinine are stable, hypertension is "VERY GOOD" (emphasis in original), and a slight increase in proteinuria. (Tr. 519-20). Dr. Cusano notes that plaintiff feels well, but he is not always taking his medications, including the CellCept due to diarrhea. (Tr. 520).

22

There is also a question as to whether plaintiff's lupus activity has increased versus medication non-adherence. (Tr. 520). Dr. Cusano encouraged plaintiff to take his medication as prescribed. (Tr. 520).

Laboratory testing for 2010 and 2011 notably revealed high levels of aldolase, microalbumin, lymph, ALT, and protein in plaintiff's urine (Tr. 455-62, 484-85, 532, 537, 541). He also tested positive for DNA Ab Double Stranded (Tr. 458, 532, 539). Blood was also detected in plaintiff's urine. (Tr. 457, 461, 485, 538).

### 6.   Staywell Health Center (Tr. 820-864)

Plaintiff's care continued in 2011 and 2012 at Saywell Health Center. (Tr. 820-64). He first presented in June 2011 for a physical, which was normal. (Tr. 820-23). Plaintiff complained of pain, which he rated as a seven. (Tr. 820-22). Plaintiff returned on August 12, 2011, following a five-day admission to St. Mary's Hospital for an acute pulmonary embolism secondary to lupus. (Tr. 824); see also Tr. 839-50 (St. Mary's Hospital records relating to plaintiff's admission for the pulmonary embolism). Plaintiff complained of chronic joint pain, but had an "overall normal" musculoskeletal exam. (Tr. 823-24, 827). At another follow-up appointment on September 2, 2011, plaintiff reported a pulmonologist placed him on an anticoagulant "for life." (Tr. 829); see also Tr. 855-56 (report of pulmonologist's consultation noting that the pulmonary embolism was  unprovoked

23

and "most likely secondary to hypercoagulable state due to lupus itself."). In December 2011, plaintiff complained of pain, but a musculoskeletal examination was normal and did not reveal any tenderness or limitation of motion. (Tr. 836-37).

### 7. Dr. Carol R. Honeychurch Disability Determination Explanation (initial level) dated March 24, 2010 (Tr. 61-67)[15]

After reviewing medical records, Dr. Honeychurch concluded that plaintiff suffers from the severe medically determinable impairments of Systemic Lupus Erythematosus and Chronic Renal Failure. (Tr. 64). She considered Listings 14.02 (Systemic Lupus Erythematosus) and 6.02 (Chronic Renal Failure). (Tr. 64). Considering the total medical and non-medical evidence of record, Dr. Honeychurch found plaintiff partially credible because, "[t]he alleged limitations regarding the rheumatological disorder and kidney disease are out of proportion to the medical evidence. The objective MER is comparable with medium exertion." (Tr. 64). In her physical RFC assessment, Dr. Honeychurch concluded that plaintiff had the following exertional limitations: could occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk and sit for a total of 6 hours in an 8 hour workday; and push and pull unlimited, other than the limitations shown for lifting and carrying. (Tr. 65). No postural, manipulative, visual,

---

[15] The Disability Determination Explanations for plaintiff's CIB claim (Tr. 61-67), and DI claim (Tr. 69-72), are identical.

communicative or environmental limitations were identified. (Tr. 65). Ultimately, plaintiff was found not disabled. (Tr. 67).

### 8.    Dr. Khurshid Khan Disability Determination Explanation (Reconsideration) dated June 16, 2010 (Tr. 77-85)[16]

On reconsideration, Dr. Khan considered additional medical evidence from Drs. Blanco, Memet, Cusano, and Hafez. (Tr. 78-79).  After reviewing medical records on reconsideration, Dr. Khan fully concurred with Dr. Honeychurch's assessment of plaintiff's medically determinable impairments and credibility. (Tr. 81-82). In his physical RFC assessment, Dr. Khan concluded that plaintiff had the following exertional limitations: could occasionally lift 25 pounds; frequently lift 10 pounds; stand, walk and sit for a total of 6 hours in an 8 hour workday; and push and pull unlimited, other than the limitations shown for lifting and carrying. (Tr. 82). Dr. Kahn identified the following postural limitations: occasional climbing of ramps/stairs; frequent balancing, stooping, kneeling and crawling; and no climbing ladders, ropes and scaffolds. (Tr. 82-83). No manipulative, visual, communicative or environmental limitations were identified. (Tr. 83). Ultimately, plaintiff was found not disabled. (Tr. 84).

---

[16] The Disability Determination Explanations - Reconsideration for plaintiff's CIB claim (Tr. 77-85), and DI claim (Tr. 87-95), are identical.

### D.   *Disability Reports*

#### 1.   **Child Disability Report dated April 20, 2007 (Tr. 267-73)**

A child disability report dated April 20, 2007, noted that plaintiff had been disabled since January 20, 2006, due to lupus. (Tr. 268). At the time of the report, plaintiff was taking enapril, Cellcept, prednisone, plaquenil, bactrim, and aspirin. (Tr. 270). The report concludes with a remark that plaintiff's mother, "will be making an appointment with a psychiatrist because of [plaintiff's] forgetfulness." (Tr. 272).

#### 2.   **Field Office Disability Reports**

A field office disability report dated January 22, 2010, reflects a disability interviewer's observations of plaintiff. (Tr. 275-77). The interviewer did not observe plaintiff having difficulty with, <u>inter</u> <u>alia</u>, concentrating, sitting, standing, walking, using hands, or breathing. (Tr. 276).  In a second face-to-face contact with plaintiff on April 20, 2010, the interviewer did not observe plaintiff having any difficulties. (Tr. 302-04). During the interview, plaintiff "stated he's in a lot of pain due to the lupus, has [high blood pressure], [] headaches, stomach aches due to meds, can't sit-stand-move (sic) around due to joint pain." (Tr. 303).

#### 3.   **Adult Disability Report Undated (Tr. 278-86)**

In an undated disability report, plaintiff notes that he has suffered from Lupus (SLE) since January 20, 2006, which causes him pain and other symptoms. (Tr. 279).  Plaintiff

26

indicates that he was then taking Cellcept (lupus), enalapril (blood pressure); naproxen (pain), plaquenil (lupus); prednisone (lupus); prevacid (stomach acid); and tramadol (pain). (Tr. 282).

### 4. Disability Report – Appeal (Tr. 295-301)

Since plaintiff's last disability report dated January 22, 2010, plaintiff reports that his lupus has worsened, he has developed seizures, and has joint, back, leg and shoulder pain. (Tr. 295). Plaintiff reports that his high blood pressure prevents him from doing much, and that he becomes tired easily. (Tr. 295). He also reports that he cannot stand, walk or sit for "too long" (Tr. 295), and that he experiences joint pain when taking care of his personal needs. (Tr. 299). He also records experiencing headaches, stomach aches and diarreah. (Tr. 299).

### 5. Disability Report – Appeal (Tr. 318-323)

Since plaintiff's last disability report dated April 20, 2010, plaintiff reports that he experiences "extreme pain," headaches, stomach aches, and that his "walking is bad." (Tr. 318). He also reports difficulty walking, bending, sitting, and lifting. (Tr. 318). Plaintiff also reports difficulties caring for his personal needs and that, "his mother helps him, he cannot stand-sit-walk-bend-lift for too long he[']s in pain often due to the lupus and joint pain. [H]e stays in [the] house[,] if he does anything he[']s in pain for several days." (Tr. 321).

### E.    Other Evidence of Record

#### 1.    Function Report – Child Age 12-18 dated April 20, 2007 (Tr. 253-63)

Plaintiff's mother completed a Child Function Report for plaintiff, dated April 20, 2007. (Tr. 253-63). The majority of the form is answered in the negative, including whether plaintiff has limitations in his activities of daily living, understanding, taking care of his personal needs, and ability to pay attention. (Tr. 258-61). However, it is stated that plaintiff's abilities to walk, run, swim, ride a bike, throw a ball, jump rope, play sports, and use video game controllers are affected. (Tr. 259).

#### 2.    Recent Medical Treatment Reports (Tr.  313; 326)

After January 1, 2010, plaintiff reports having seen Drs. Hafez, Cusano and Memet. (Tr. 313). He also states, "I cannot expose myself to the sun, because the sun will active (sic) the illness, I can't do any heavy lifting, I can't stress myself." (Tr. 313).

#### 3.    Waterbury Public Schools Education Records (Tr. 329-335)

A cover sheet preceding the education records indicates that plaintiff "was not special ed[.]" (Tr. 329). Plaintiff was enrolled in John F. Kennedy High School from 2005 to 2009. (Tr. 300). Plaintiff's grades over the years ranged from an 89 (high B) to a 32 (F), with his grades largely falling below passing during his sophomore (2006-07) and junior years (2007-08).  (Tr.

330).  During his senior year (2008-09), plaintiff passed all courses, with his lowest grade being 69 (high D). (Tr. 330).[17]

## IV.  THE ALJ'S DECISION

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected… to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[18] Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. The Court presumes familiarity with this sequential evaluation and accordingly need not recite the specific steps herein.

Following the five step evaluation process, ALJ Thomas concluded that plaintiff was not disabled under the Social

---

[17] Treatment records also reflect notes about plaintiff's attendance at school. A medical record from February 2006 notes that plaintiff "has missed a significant amount of schoolwork and is failing most of his classes. Social work was consulted to arrange for a 504 plan and tutoring services and the CCMCs teacher was contacted to work with [plaintiff]." (Tr. 342). However, by April 10, 2006, he was attending a full day without problems. (Tr. 365); see also Tr. 382 (September 11, 2006 treatment note reflects plaintiff was attending school with no problems making it through the day); Tr. 385 (reported passing all but one class); Tr. 604 (August 26, 2008 treatment note stating plaintiff "failed 3 classes last year."); Tr. 598, 600 (December 1 and 2, 2008 treatment notes stating plaintiff missed four to five days of school due to pain); Tr. 404 (March 27, 2009 treatment note states plaintiff missed fourteen days of school to date).

[18] The Court agrees with defendant's position that plaintiff's CIB claim should be evaluated pursuant to the adult disability standards given that he was nineteen years old at the time he applied for benefits. See 42 U.S.C. § 402(d)(1)(B)(i) (CIB are available to those who, "at the time [the] application was filed[…] either had not attained the age of 18 or was a full-time elementary or secondary school student and had not attained the age of 19.").

Security Act. (Tr. 19).  ALJ Thomas initially found that as of

January 20, 2006, plaintiff had not attained age 22. (Tr. 14).

At step one, the ALJ found that plaintiff had not engaged in

substantial gainful activity since January 20, 2006, the alleged

onset date. (Tr. 14).  At step two, the ALJ found that plaintiff

had the severe impairment of Systematic Lupus Erthematous

("lupus" or "SLE") with generalized arthritis. (Tr. 14).

At step three, the ALJ found that plaintiff's impairments,

either alone or in combination, did not meet or medically equal

the severity of one of the listed impairments in 20 C.F.R. Pt.

404, Subpt. P, App. 1. (Tr. 15). The ALJ specifically considered

Listings 1.00 (Musculoskeletal System Listings) and 14.00

(Immune System Disorder Listings). (Tr. 15). Before moving onto

step four, the ALJ found plaintiff had the residual functional

capacity ("RFC") to perform the full range of sedentary work as

defined in 20 C.F.R. §§ 404.1567 (a) and 416.967(a). (Tr. 15).

At step four, the ALJ found that plaintiff had no past relevant

work, and then moved onto step five where he determined that,

considering plaintiff's age, education, past work experience,

and RFC, there are jobs that exist in the national economy that

plaintiff can perform. (Tr. 19).

## V.   DISCUSSION

On appeal, plaintiff asserts the following arguments in

favor of reversal or remand:

> 1. The ALJ erred at Step Three by finding plaintiff did not
>    meet Listing 14.02;

2. The ALJ "cherry-picked" and "parsed" the evidence;

3. The ALJ erred in assessing plaintiff's credibility; and

4. The ALJ erred in his consideration of plaintiff's non-compliance.

The Court will address each of plaintiff's arguments in turn.

### A.   Step Three Determination

Plaintiff extensively argues that the ALJ erred in finding that he did not meet a Listing. Defendant argues that the ALJ's step three finding is supported by substantial evidence and legally correct. For the reasons that follow, the Court finds that the ALJ did not err at step three of the disability analysis.

Plaintiff bears "the burden of proof at step three to show that [his] impairments meet or medically equal a Listing." Rockwood v. Astrue, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citation omitted). In order to meet this burden, plaintiff must show that his medically determinable impairment satisfies all of the specified criteria in a Listing. See 20 C.F.R. §§ 404.1525(d), 416.925(d); see also Malloy v. Astrue, No. 3:10cv190(MRK)(WIG), 2010 WL 7865083, at *23 (D. Conn. Nov. 17, 2010) ("An impairment that manifests only some of those criteria, no matter how severe, does not qualify."). To make this showing, the plaintiff must present medical findings equal in severity to all requirements which are supported by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 416.926. "Courts have required an ALJ to provide an

31

explanation as to why the claimant failed to meet or equal the Listings, where the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." Rockwood, 614 F. Supp. 2d at 273 (citation and internal quotation marks omitted). "However, if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence." Id. (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982)).

Plaintiff argues that he meets Listing 14.02 for Immune System Disorders Systemic Lupus Erythematosus. After "carefully considering all of the listed impairments, and in particular, the 1.00 Musculoskeletal System Listings, and the 14.00 Immune System Disorders Listings," the ALJ found that plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[…]" (Tr. 15). The ALJ further explained that, "The medical evidence does not substantiate listing-level severity of the claimant's impairments, and no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. 15).

Listing 14.02 deals with an immune system disorder, namely, systemic lupus erthuematosus ("SLE"). See 20 C.F.R. pt. 404, Subpt. P, App. 1, §14.02. SLE is "a chronic inflammatory disease

that can affect any organ or body system," including an individual's respiratory, cardiovascular, renal, blood, skin, neurologic, mental, or immune systems. Id. §14.00(D)(1). To meet Listing 14.02(A), a claimant must demonstrate that he suffers from SLE accompanied by the "[i]nvolvement of two or more organs/body systems, with: [o]ne of the organs/body systems involved to at least a moderate level of severity; and [a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." Id. §14.02(A).

### 1.   Listing 14.02(A)(1)

Plaintiff first argues that he meets Listing 14.02(A)(1) because he has several organ/body systems involved at a severe level, including his kidneys, musculoskeletal system, nervous system, autoimmune system, and gastrointestinal system. Defendant argues that the "evidence does not bear this out."

As an initial matter, the record supports a finding of kidney involvement, but there is also substantial evidence that this involvement was not to a moderate level of severity. Although plaintiff in early 2006 was near renal failure (Tr. 248-49, 356-57, 359), subsequent treatment notes and laboratory tests reveal in large part improved urinalysis and stable kidney function. See, e.g., Tr. 369 (treatment note from May 8, 2006 reflecting improved urinalysis); Tr. 382 (September 11, 2006 treatment note stating last month's lab tests were stable); Tr.

33

390 (January 24, 2007 treatment note stating that plaintiff's lupus nephritis "appears stable."); Tr. 600 (December 2, 2008 treatment note stating plaintiff "continues to do extremely well with normal blood pressure, [and] only microscopic hematuria in a nonactive urinary sediment."); Tr. 604 (August 26, 2008 treatment note reflecting near normal urinalysis); Tr. 503-04 (May 3, 2010 treatment note stating, "Urinalysis reveals no evidence of active kidney disease," and that most recent blood tests revealed normal kidney function); Tr. 506 (noting June 2010 blood test as "unremarkable"); Tr. 632 (noting that November 2010 blood tests revealed stable normal kidney function); Tr. 699, 703, 707 (August, September and November 2011 blood tests revealed stable kidney function).

Plaintiff next argues that his musculoskeletal system is also involved to at least a moderate level of severity in light of his documented joint and muscle pain.[19] Defendant argues that

---

[19] Defendant argues that this system is not relevant to the Listing 14.02 analysis in light of the following language:

> Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.00(D)(1)(a). The Court disagrees with defendant's interpretation that the only relevant major organ/body systems to the Listing 14.02 analysis are those listed in section 14.00(D)(1)(a). The immune system disorder listings were revised in 2008 to reflect those currently in effect. See, e.g., Brown

34

the record suggests that plaintiff's musculoskeletal pain is not a result of his lupus, but rather attributable to fibromyalgia or myofacial pain syndrome. Defendant further argues that to the extent that there is evidence suggesting plaintiff's pain is related to his lupus, conflicts in the medical evidence are for the Commissioner to resolve. The record is replete with plaintiff's complaints of musculoskeletal pain. However, substantial evidence supports a finding that lupus was not necessarily the cause of these complaints. See Tr. 425 ("The source of his pain is unclear; he does not have arthritis or synovitis by exam. He has mechanical low back and hip pain. His hand pain is of unclear etiology."); Tr. 436 ("There was also a question of diffuse muscle pain, arthralgias, especially of the shoulders, upper back, and hips which raised the question of fibromyagia."); Tr. 439 ("He does have musculoskeletal complaints which could be due to secondary fibromyalgia."); Tr. 504 ("On and off upper and lower back discomfort most likely due to secondary fibromyalgia."); Tr. 508 ("He has on and off diffuse body aches and pains which most likely are due to

---

v. Astrue, Civil Action No. H-08-2299, 2010 WL 1257804, at *8 (S.D. Tex. March 25, 2010)(comparing 2007 version of Listing 14.02 with that in effect as of March 2010). Listing 14.00(D)(1)(A), upon which defendant relies, was also revised to the version cited by defendant. The Revised Medical Criteria for Evaluating Immune System Disorders provides the rationale for this revision: "In final 14.00D1, Systemic lupus erythematosus (14.02), we expand and clarify the information in prior 14.00D1a. In final 14.00D1a, General, we explain that systemic lupus erythematosus (SLE) may involve any organ or body system and describe by body system some potential manifestations of SLE." Revised Medical Criteria for Evaluating Immune System Disorders, 73 Fed. Reg. 14570 (March 18, 2008) (emphasis added). This language refutes defendant's interpretation of §14.00(D)(1)(a) and indeed confirms that the list of potentially involved organ/body systems is not exclusive. Therefore, the Court will consider involvement of plaintiff's musculoskeletal impairments, among others.

secondary fibromyalgia."); Tr. 512 (He does have diffuse chronic
body pain which most likely is due to fibromyalgia."); Tr. 636
(reflecting January 13, 2011 diagnosis of fibromyalgia); Tr.
705-06 (reflecting October 20, 2011 diagnosis of fibromyalgia
and noting, "Lower and upper back pain, chronic, likely related
to myofascial pain syndrome. No significant pathology on recent
MRI of the lower back."); Tr. 707 & 709 (December 1, 2011
treatment note listing fibromyalgia as one of plaintiff's active
problems).

    Plaintiff next argues that his nervous system was also
involved to at least a moderate level of severity based on his
intermittent headaches, difficulty concentrating, dizziness, and
depression. Defendant argues that none of these symptoms
severely affected plaintiff for any significant period of time.
For purposes of Listing 14.02, the term "[s]evere means medical
severity as used by the medical community. It does not have the
same meaning as it does when we use it in connection with a
finding at the second step of the sequential evaluation
processes in §§ 404.1520, 416.920, and 416.924." 20 C.F.R. Pt.
404, Subpt. P, App. 1, §14.00(C)(12). The Court agrees that the
record does not support a finding of moderately severe
involvement of plaintiff's nervous system. First, throughout the
record, plaintiff regularly denied complaints of dizziness. See,
e.g., Tr. 416, 453, 480, 520, 527, 696, 704, 821, 824, 833. The
medical evidence further does not support a finding that

36

plaintiff suffered from moderately severe concentration problems. For example, the record reflects that plaintiff was "back at school, attending full day without problems," (Tr. 365), and that he "reported no problems making it through the day [at school]." (Tr. 382); see also Tr. 385 (plaintiff "reports that he is going to school and passing all but one of his courses."). Although evidence of record reflects that plaintiff had many absences from school on account of headaches and/or other pain, see, e.g., Tr. 404, 427-28, substantial medical evidence fails to confirm the presence of moderately severe concentration issues. Similarly, the record fails to reflect evidence of moderately severe depression. For example on November 30, 2010, plaintiff admitted that his mood had been "down", but denied suicidal or harmful thoughts. (Tr. 510). Further, although the record reflects complaints of depression, there is no evidence that plaintiff saw a psychologist or psychiatrist or began antidepressant medication for this condition. See Tr. 512 (declining low dose Cymbalta to treat fibromyalgia and depression); Tr. 704-06 (noting complaints of anxiety and depression and that plaintiff "is to see a psychologist at a behavioral center in Waterbury."); Tr. 707-09 ("He hasn't seen the psychiatrist yet as he is looking more into talking to a psychologist. He is very reluctant to start an antidepressant medication as he is already taking multiple medications."); Tr. 81-22 (past medical history includes

37

depression, but review of systems states, "[n]o anxiety, no depression[…]"); Tr. 833 ("No depression.");  Tr. 841 (review of systems negative for depression). Finally, substantial medical evidence does not support a finding of moderately severe headaches. Again, although the record reflects plaintiff's complaints of headaches (Tr. 379, 388[20], 390, 406, 427-29[21], 708, 832[22]), there is also substantial evidence of these headaches resolving and/or plaintiff's denial of experiencing such symptoms. See Tr. 362 ("He has had no further headaches."); Tr. 365 ("[H]e has been doing well and he has had no complaints of headache."); Tr. 369 ("[H]e has had no headaches[…]"); Tr. 382 ("He has had only 1 headache in the last month); Tr. 606 ("He complains of only occasional headaches now."); Tr. 385 ("His headaches are under good control and he reports that he is going to school and passing all but 1 of his courses."); Tr. 423, 440-41, 453, 480, 520, 527, 700, 829, 855 (no headache). Finally, the Court notes that on several occasions, plaintiff denied suffering neurological symptoms. (Tr. 434, 504, 511).

Plaintiff next argues that his autoimmune system is severely involved. Plaintiff specifically points to his experiencing a pulmonary embolism and diagnosis of

---

[20] This complaint of headache appears connected to plaintiff's elevated blood pressure levels. (Tr. 388).

[21] "He had a headache today that resolved when he ate food." (Tr. 429).

[22] Complaints of headache appear related to his diagnosis of allergic rhinitis. (Tr. 832-35). The Court also notes that the review of systems reflects "No headache." (Tr. 833).

antiphospholipid syndrome as evidence of his autoimmune anti-coagulation disorder. Defendant argues that this claim does not "pass muster." Again, the Court finds that evidence does not support a finding that this system was involved to a moderate degree of severity. Although suffering a pulmonary embolism is undoubtedly a "serious event", the record supports a finding that this condition was likely due to, among other factors, plaintiff's non-compliance with his lupus medication. See Tr. 697 ("Pulmonary embolism likely related to APLA's and primary hypercoagulable state and non-compliance with his medications. No previous episode of thromboelbolic disease."); Tr. 699 ("He has lupus with Class 4 lupus nephritis and recent pulmonary embolism in the setting of positive antiphospholipid antibodies and worsening proteinuria due to non-compliance with medications."); Moreover, the record also supports a finding that this condition has resolved and is controlled with medication. See Tr. 699 ("He is doing well. He reports mild lingering chest discomfort, but overall improved. He denies cough or shortness of breath); Tr. 702 ("He will continue with anticoagulation with Coumadin."); Tr. 706, 827 (noting plaintiff will continue with Coumadin); Tr. 824 (denying chest pain or discomfort); Tr. 829 ("Saw pulmonologist with no new recs (sic) except to stay on Coumadin for life."); Tr. 820-22, 824-25, 827, 830, 832-34, 836-37 (denying pulmonary symptoms and reflecting normal findings on examination).

39

Finally, plaintiff cursorily argues that his liver and gastrointestinal systems are involved to a moderately severe degree. However, because plaintiff does not expand on his argument concerning gastrointestinal involvement, the Court deems this waived. Further, with respect to involvement of his liver, plaintiff only points to evidence of "mildly elevated transaminases due to a mild degree of occult myositis." [Doc. #20-1, 31]. This, however, does not support a finding that plaintiff's liver is involved to a moderately severe degree.

Accordingly, for the reasons stated, the Court finds that substantial evidence supports the ALJ's finding that plaintiff's SLE did not cause the involvement of two or more organs/body systems with one involved at least to a moderate level of severity.

### 2.   Listing 14.02(A)(2)

Plaintiff also argues that he meets the second prong of 14.02 (A) because he suffers from at least two constitutional symptoms or signs. Defendant argues that plaintiff cannot show that he meets part (A)(2) of Listing 14.02. The Court agrees.

Plaintiff begins his argument by quoting a medical dictionary's definition of the term "constitutional symptoms." [Doc. #20-1, 31]. He then goes on to state that other constitutional symptoms include pain and "involuntary obesity." [Id. at 31-32]. However, this argument ignores the express definition of "Constitutional symptoms and signs" provided by

40

the Listings. Section 14.00(C)(2) states that,

> Constitutional symptoms or signs, as used in these listings means severe fatigue, fever, malaise, or involuntary weight loss. Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.00(C)(2) (emphasis in original). Therefore, to the extent plaintiff argues his pain and involuntary obesity are "constitutional symptoms," these arguments are without merit. Moreover, the record fails to indicate plaintiff suffered from involuntary weight loss or fevers. Indeed, plaintiff consistently denied these symptoms. See Tr. 348, 359, 377, 379, 423, 428, 437, 441, 504, 507, 511, 639, 696, 700, 704, 708, 821, 824, 829, 836, 841, 855 (fevers); Tr. 423, 504, 511, 700, 824, 829, 836, 841 (involuntary weight loss). Although plaintiff did complain of fatigue, he also frequently denied experiencing this symptom. See Tr. 824, 827, 833 (denying fatigue). Further, the record does not support a finding that plaintiff's fatigue was "severe" as defined by the Listings. See, e.g., Tr. 639, 700, 704, 708 (reports of "feeling tired" but no mention of exhaustion or significantly reduced physical activity or mental function). Finally, medical evidence of record does not support a finding of malaise resulting in significantly reduced physical activity or mental function. For example, plaintiff frequently denied experiencing general malaise. See Tr. 507, 821, 824, 829, 832.

41

Accordingly, for the reasons stated, the Court finds that there is not substantial evidence to support a finding that plaintiff suffers from at least two of the constitutional symptoms or signs required by Listing 14.02(A)(2).[23]

Finally, in support of his Listing arguments, plaintiff makes a passing argument that "there was no reason to reject the opinion evidence of board specialized rheumatologist [Dr. Memet]." [Doc. #20-1, 32]. Dr. Memet opined, in pertinent part, that plaintiff has malaise, significant fatigue and 2 or more organs/body systems involved with at least 1 at a moderate level of severity, but only identified kidney involvement. (Tr. 875). She also opined that during a flare, plaintiff experiences marked limitation of activities of daily living, maintaining social functioning, and limitations in concentration, persistence and pace. (Tr. 876). The ALJ accorded this opinion no weight "as it is not supported by diagnostic imaging or by Dr. Memet's own treatment records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment." (Tr. 18).

Pursuant to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will usually be given more weight than a non-treating

---

[23] It is unclear whether plaintiff submits that he also meets Listing 14.02(B). A claimant can meet Listing 14.02(B) if they suffer from "[r]epeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" as well as marked limitations in either their activities of daily living, social functioning, or ability to complete tasks in a timely manner due to deficiencies in concentration, persistence, or pace. 20 C.F.R. pt. 404, subpt. P, app. 1, §14.02(B). Regardless, the Court finds substantial evidence supports a finding that plaintiff does not meet this Listing for reasons already stated with respect to Listing §14.02(A)(2).

source.  If it is determined that a treating source's opinion on
the nature and severity of a plaintiff's impairment is "well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in the record," the opinion is given
controlling weight.  20 C.F.R. § 404.1527(c)(2).  If the
opinion, however, is not "well-supported" by "medically
acceptable" clinical and laboratory diagnostic techniques, then
the opinion cannot be entitled to controlling weight. If the
treating source's opinion is not given controlling weight, the
ALJ considers the following factors: length of treatment
relationship, frequency of examination, nature and extent of the
treatment relationship, relevant evidence used to support the
opinion, consistency of the opinion with the entire record, and
the expertise and specialized knowledge of the source.  20
C.F.R. § 404.1527(c)(2)-(6).  S.S.R. 96-2P, 1996 WL 374188, at
*2 (S.S.A. Jul. 2, 1996).  "Medically acceptable" means that the
"clinical and laboratory diagnostic techniques that the medical
source uses are in accordance with the medical standards that
are generally accepted within the medical community as the
appropriate techniques to establish the existence and severity
of an impairment."  S.S.R. 96-2P, 1996 WL 374188, at *3 (S.S.A.
Jul. 2, 1996).  Furthermore, "not inconsistent" means that the
opinion does not need to be consistent with _all_ other evidence,
but rather there must not be "other substantial evidence in the

case record that contradicts or conflicts with the evidence."
Id. (emphasis added). If the treating physician's opinion is not
supported by objective medical evidence or is inconsistent with
other substantial evidence in the record, the ALJ need not give
the opinion significant weight. See Poupore v. Astrue, 566 F.3d
303, 307 (2d Cir. 2009).

For reasons already stated, the Court concludes there is
substantial evidence to support the ALJ's decision that Dr.
Memet's opinions were inconsistent with the record as a whole
and not entitled to controlling weight.

### B.   Alleged "Parsing" of Evidence

Plaintiff next argues that the ALJ "parsed" the evidence
and "cherry-picked" progress notes containing words such as
"stable," "in no acute distress," and "well." [Doc. # 20-1, 35].
Defendant responds that the ALJ adequately evaluated the
evidence of record.

The Court finds that the ALJ did not "cherry pick" the
evidence. The ALJ specifically stated several times that he
considered the "entire record" (Tr. 14-15) and "all of the
medical evidence of record and treatment notes received during
the development of the record" (Tr. 19). He then discussed the
record evidence upon which he relied in detail (Tr. 16-18). The
Court has carefully reviewed every page of the nearly 900 page
record and concludes that the ALJ's overview of the evidence was
both fair and accurate. For example, the ALJ notes that,

"Records from the claimant's Nephrologist denote improvement in the claimant's condition with treatment. (Exhibit 3F)." (Tr. 16). He then goes on to cite specific treatment records supporting this conclusion. Exhibit 3F, upon which the ALJ relies, consists of forty eight pages of treatment notes from Drs. Sardegna and Edelheit dating from February 2006 through January 2007. (Tr. 345-92). These records generally support the ALJ's conclusion the plaintiff's condition improved with treatment. See, e.g., Tr. 362-63 (plaintiff's mother reported he had been doing much better and there is noted good compliance with medications to which Dr. Sardegna reflects plaintiff "has never looked better"; plaintiff's blood pressure also noted as "stable."); Tr. 365 (noting excellent blood pressure, and reports that plaintiff has been doing well and attending a full day of school without problems); Tr. 369 (noting improvement in plaintiff's labs and urinalysis); Tr. 375 ("At this time, [plaintiff] has no clinical complaints whatsoever, other than some acne," and further noting plaintiff working "a lot of hours" picking up garbage); Tr. 382 ("[Plaintiff] has been doing fairly well. His lab tests last month were stable and his sedimentation rate and complement levels were good[…]"); Tr. 385-86 ("His blood pressure, proteinuria and creatinine remain good. However, he still has some elements of active nephritis[…] Overall, I am pleased by his progress and his lupus serology tests continue to be excellent[…]"); Tr. 390 (noting creatinine

45

and lupus nephritis appear stable and hypertension under very good control).

The same is true for the remaining medical records upon which the ALJ relies. Indeed, the ALJ's other statements reflecting plaintiff's condition had improved or that he was doing well or stable are supported by substantial evidence. See, e.g., Tr. 440 ("He is overall doing well with no joint swelling or significant stiffness."); Tr. 453 ("pt doing well [with] proteinurea and all likely minimal if any nephritis @ present."); Tr. 503-04 ("He continues to do well on current therapy with Cellcept, Plaquenil, and low dose prednisone[…] He is otherwise doing well. He denies joint pain, swelling. He has on and off aches and pains which seem to be mostly skeletal related[…] His most recent blood test at the end of March [2010] revealed normal cell counts, kidney function, liver function tests, as well as urine analysis that failed to reveal significant proteinuria or active sediment."); Tr. 512 ("So far his previous blood test revealed no evidence of lupus activity, however he understands that if he stops taking immunosuppressive medications the lupus may become active."); Tr. 529 (Dr. Cusano noting that plaintiff is "Doing very well [with] lupus activity[…]"); Tr. 598-99 ("This is an almost 18-year-old male with longstanding [SLE] who clinically appears to be doing quite well, other than his amplified pain. Dr. Sardegna and I were able to speak with [plaintiff] and his mother at length about

how pleased we are at his lupus control[…] At the time of this
dictation, [plaintiff's] labs looked excellent[…] We also
explained that during a time of relative remission is a better
time for transition [to a different doctor]."); Tr. 601
(reflecting similar sentiments as that in Tr. 598-99); Tr. 604
("He has been doing very well in the last several months with
normal complements, sedimentation rate, and an anti-DNA and ANA
that were normal in June."); Tr. 632 ("He is overall doing
well[…] previous blood tests obtained in November [2010]
revealed stable normal kidney function, normal complemet level,
stable low double dsDNA at 9 and more active urinary sediment
with moderate blood and increased protein."); Tr. 638-40 ("He is
overall doing well[…] He reports general body pain, which seems
to be better controlled with tramadol and naproxen […] He
appears well and in no acute discomfort."); Tr. 699, 703, 707[24],
851 (plaintiff is "doing well"); Tr. 823 (reflecting a "normal
routine history and physical.").

Further, the Court notes that there is substantial evidence
that reflects mostly normal or unremarkable physical exams and
findings. See, e.g., Tr. 348, 376, 598 (reflecting full range of
motion on musculoskeletal exam and normal gait); Tr. 390 (normal
MRI in setting of headache complaints); TR. 423-25 (reflecting
largely normal physical examination results); Tr. 438 (full hand
strength and normal muscle strength in both upper and lower

---

[24] Plaintiff reported doing well although he complained of worsening diffuse
body pain. (Tr. 707).

extremities, but mild tenderness of lumbar paravertebral muscle area); Tr. 441, 504, 507 (normal musculoskeletal examinations including full range of motion, no tenderness, and normal muscle strength of upper and lower extremities); Tr. 640 (no evidence of muscle weakness in upper and lower extremities upon examination); Tr. 703, 721 (recent MRI of lower back failed to reveal significant disc herniation but did show a minor broad central bulge without stenosis at L5-S1); Tr. 827, 834, 837 (normal findings on musculoskeletal exam).

More importantly, the Court finds that substantial evidence, as recited above, supports the ALJ's decision. Indeed, so long as there is substantial evidence supporting the decision in the record, any evidence in the record which could have supported a different conclusion does not undermine the Commissioner's decision. Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); see also Miles v. Harris, 645 F.3d 122, 124 (2d Cir. 1981) ("We are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony… It is sufficient that the ALJ noted he carefully considered the exhibits presented in evidence in reaching his decision.").

Accordingly, the Court finds no error in the ALJ's evaluation of the evidence.

### C.  Credibility Findings

Plaintiff next argues that the ALJ failed to properly assess his credibility. Defendant argues that substantial

evidence supports the ALJ's credibility determination. The ALJ is required to assess the credibility of the plaintiff's subjective complaints. 20 C.F.R. § 416.929.  Where the claimant's testimony concerning pain and functional limitations is not supported by objective evidence, the ALJ retains discretion in determining the plaintiff's credibility with regard to disabling pain and other limitations.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

The courts of the Second Circuit follow a two-step process. The ALJ must first determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  20 C.F.R. § 416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."). Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms. Here, the ALJ must first determine if objective

evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors laid out at 20 C.F.R. § 416.929(c). See, e.g., Snell, 177 F.3d at 135 ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings."); Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010).  These factors include: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; and (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain. 20 C.F.R. § 416.929(c)(3)(i)-(iv); 20 C.F.R. § 404.929(c)(3)(i)-(iv).  The ALJ must consider all the evidence in the case record.  SSR 96-7p, 1996 WL 374186, at *5 (Jul. 2, 1996).  Furthermore, the credibility finding "must contain specific reasons […] supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.  "Even if subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability."  Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citation omitted). "Put another way, an ALJ must assess subjective evidence in light of objective medical facts and diagnoses."

Williams, 859 F.2d at 261.

The Court finds that the ALJ conducted a proper credibility assessment, and that substantial evidence supports his credibility determination. In this case, the ALJ made the following finding regarding plaintiff's credibility:

> The claimant alleges that his condition negatively affects his ability to do work-related activities on a day-to-day basis in a regular work setting. At the hearing and on forms submitted in conjunction with his application for disability, the claimant testified/alleged that his impairments affected his memory, as well as his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, get along with others, understand[], follow instructions, use his hands, and concentrate.
>
> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> In reference to the claimant's physical impairments, the medical evidence of record supports the above-articulated physical limitations in the residual functional capacity; however the record does not support the extent of symptoms and resulting limitations alleged by the claimant.

(Tr. 15-16). The ALJ then explained this credibility finding through a detailed analysis of the relevant evidence in the record (Tr. 16-18), and concluded:

> The claimant alleges that his impairments render him unable to engage in substantial gainful employment of any kind, however, the medical evidence of record does not support this. Although the claimant does have limitations, the objective evidence does not support total disability.
>
> Although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Furthermore, the record indicates that the claimant is not working due to an

> insurance-related issue, rather than because of allegedly
> disabling impairments. Treatment records from Rheumatology
> Associates of Greater Waterbury reveal numerous visits
> wherein it was reported that the claimant was hesitant
> about looking for work, as he and his mother did not want
> him to no longer qualify for insurance. (Exhibit 13F).

(Tr. 18).

Plaintiff first argues that, "The ALJ denied benefits based on the fact that 'on June 4, 2009, Dr. Cusano reported that the claimant had engaged in basketball and baseball.' Essentially, the ALJ treated this statement as if it were a measure of functional capacity." [Doc. #20-1, 37]. The Court disagrees with plaintiff's characterization of the ALJ's decision. The relevant portions of the ALJ's decision state that, "On February 12, 2009, Dr. Cusano reported that the claimant was doing very well with his Lupus, and on June 4, 2009, he reported that the climant had engaged in basketball and baseball," (Tr. 16), and "On April 18, 2011, Dr. Memet reported that the claimant has been doing well overall, and that he was playing basketball once a week" (Tr. 17). These statements accurately reflect the medical records upon which the ALJ relies. See Tr. 531 (Dr. Cusano treatment note dated June 4, 2009 indicating plaintiff was exercising outside with his brother and "playing basketball and baseball."); Tr. 638 (Dr. Memet treatment note stating, "He states that he is trying to be more active, and he plays basketball once a week.").

Moreover, the ALJ did not make an RFC or credibility finding on these two statements alone. Indeed, these statements

comprise only two sentences of over eleven paragraphs of
evidence summation supporting the ALJ's findings. Pursuant to
Social Security Ruling 96-7p, the ALJ properly considered
plaintiff's daily activities, the treatment he was receiving,
the consistency of his statements with other information in the
record, and his lack of compliance with medical
recommendations.[25] The record, other than the medical evidence
cited above, further supports the ALJ's credibility assessment.
For example, during the relevant time period plaintiff was noted
as working or looking for work. See Tr. 375 ([Plaintiff] is
working this summer picking up garbage. Seems to be working a
lot of hours and is happy with his job."); Tr. 377 ("He reports
occasional increased pains in the legs as well as other joins
since starting his job picking up trash."); Tr. 379
("[Plaintiff] finished his summer job which actually involved a
fair amount of walking and helped with his weight gain."); Tr.
471 ("[Plaintiff] states that he stopped taking any medications
for about two months because he was still experiencing pain
while he was taking it and that [] making him groggy and he is
looking for a job and wants to be fully alert and energetic when
working."); Tr. 480 ("Discussed pt's desire to work but loss of
insurance if he does – they cannot afford meds if he does[…]");
Tr. 511, 633 ("He is contemplating with starting a job."); Tr.

---

[25] Issues regarding plaintiff's compliance with medical recommendations are
further addressed infra.

53

639 ("He is not currently working but he is looking for a job.").

Plaintiff's activities of daily living also support a negative credibility finding, where he reported and testified to being able to perform various household chores, such as doing the laundry, cleaning, and ironing, which are inconsistent with plaintiff's self-reported limitations and allegations of total disability. See, e.g., Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a plaintiff's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.")(citing Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir. 1991); Rogers, 204 F. Supp. 2d at 894 (noting evidence of plaintiff's daily activities supported ALJ's negative credibility finding despite assertion that such activities were performed at a slower pace and with assistance from others)).

Plaintiff next argues the ALJ denied benefits based on a statement in an August 2010 treatment note that plaintiff was "doing well." The Court rejects this argument for reasons already stated in section V(B), supra.

As the Second Circuit held in Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010), "[i]t is the function of the [Commissioner], not the [reviewing courts], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." (brackets in original; internal citations and quotation marks omitted). Where the ALJ has identified specific record-based reasons for his ruling, the Court has refused to second-guess his credibility findings. Id. Likewise, here, where the ALJ has identified a number of specific reasons for his credibility determination, which are supported by substantial evidence in the record, the Court will not second guess his decision. Moreover, he had the opportunity to personally observe Plaintiff and his testimony, something the Court cannot do. Accordingly, the Court finds no error in the ALJ's assessment of plaintiff's credibility.[26]

### D.   Non-Compliance

Plaintiff next generally argues that "there is no substantial evidence of non-compliance." [Doc. #20-1, 41]. As a general matter, the Court finds that there is substantial evidence to support a finding of plaintiff's non-compliance with prescribed treatment and/or medical recommendations. Indeed, the record is replete with references of plaintiff's non-compliance with his lupus medication. See Tr. 436 ("There was also an issue with poor[] compliance with Cellcept); Tr. 510, 512 (admitting that he stopped his medications three weeks ago and noting Dr. Memet's warnings that lupus may become active if he stops

---

[26] Plaintiff's brief addressing errors in the ALJ's credibility finding makes a passing reference to an evaluation of plaintiff's pain. [Doc. #20-1, 39-41]. However, this portion of the brief is largely boilerplate and does not make a substantive argument about any errors committed by the ALJ in this particular regard. Because the Court will not make plaintiff's arguments for him, the Court deems any such argument waived.

immunosuppressive medications); Tr. 520 (admitted non-compliance with medication, particularly the Cellcept due to diarrhea; Dr. Cusano's notes reflect, "Lupus activity increased vs. med non-adherence."); Tr. 632, 637 (noting plaintiff restarted his medications which he had previously discontinued); Tr. 638 (reporting being more, but not completely, compliant with medications); Tr. 697 ("There is a history of poor medical compliance with immunosuppressive therapy."); Tr. 699, 702 (noting worsening proteinuria due to non-compliance with medications); Tr. 705 ("evidence of active disease in the setting of non-compliance with medication.") The record also reflects plaintiff's failure to follow doctors' recommendations to start a statin medication (Tr. 699, 702-03, 705), and an antidepressant (Tr. 512, 707). He also declined stronger pain medication on at least one occasion. Tr. 427 (naproxen and tramadol not helping pain, but he does not want stronger medication).

To the extent that plaintiff argues plaintiff was non-compliant with the Cellcept medication due to "chronic" and "intolerable" diarrhea, there is substantial evidence of record to refute this characterization. Indeed, the medical record paints a much different picture than that represented by plaintiff. For example, on numerous occasions plaintiff denied suffering from diarrhea or other gastrointestinal distress. See Tr. 379, 423, 428, 431, 434, 504, 511, 820-21, 824-25, 832-33

(denying diarrhea and/or gastrointestinal symptoms). Further, evidence of record also indicates that plaintiff was doing well on and "tolerating" the CellCept. See Tr. 427, 430, 433 ("He has been managed with and tolerating Cell Cept [], Plaquenil [], and Prednisone[]."); Tr. 437 (noting that plaintiff tolerates Cellcept and there are no GI symptoms); Tr. 440 ("He reports having diarrhea 3-4 x a week which most likely is related to Cellcept. The change in the Cellcept order for brand name was issued and is still pending at the pharmacy."); Tr. 503 ("He continues to do well on current therapy with Cellcept, Plaquenil, and low dose prednisone[...] He is tolerating Cellcept, the brand name medication, better with no episodes of diarrhea or abdominal discomfort); Tr. 506 ("He [] is missing three to four days of medication every other week because he gets stomach upset and diarrhea. He seems to be better tolerating therapy with Cellcept brand name which causes less GI intolerance."); Tr. 697 ("He states he is able to tolerate CellCept now despite intermittent diarrhea."); Tr. 702 ("Patient states he is now taking the medication on a daily basis which he is able to tolerate dispute intermittent diarrhea."); Tr. 707 ("He states he takes the CellCept every day religiously [] on an empty stomach and he has no significant GI disturbances or diarrhea."). Although the ALJ failed to mention this side effect in his ruling, this is not fatal to his decision where it is otherwise supported by substantial evidence. See Brault v. Soc.

Sec. Admin., 638 F.3d 443, 448 (2d Cir. 2012) (citation and internal quotation marks omitted)("[A]n ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

Moreover, to the extent plaintiff argues that "the defendant ignored that full compliance with treatment did not make a difference," [Doc. #20-1], the record does not support this argument. Indeed, records largely indicate successful management of plaintiff's lupus when he was compliant with his medications. See, e.g., Tr. 425, 429, 431, 434 (noting successful management of lupus with medication regime, including Cellcept); Tr. 438, 442 (noting lupus "quiescent on current [medication] regime."); Tr. 362-63 (noting plaintiff had never looked better and was doing well upon reported full compliance with medications).

Finally, plaintiff takes issue with the ALJ's finding that Dr. Memet "attributed [plaintiff's] pain to claimant having ceased taking his prescribed medications." [Doc. #20-1]. Although plaintiff is correct that this is not an accurate summation of Dr. Memet's treatment note, any such error is harmless in light of the other substantial evidence of record supporting the ALJ's credibility and RFC findings. The Court also notes that contrary to plaintiff's argument, [Doc. #20-1, 46] the ALJ did not deny benefits based on plaintiff's non-

compliance alone. Rather, pursuant to Social Security Ruling 96-7p, the ALJ properly considered plaintiff's non-compliance, among several other factors, in determining plaintiff's credibility.

Therefore, the Court finds no error with the ALJ's consideration of plaintiff's non-compliance.

**VI.   CONCLUSION**

For the reasons stated, plaintiff's motion to reverse, or in the alternative remand [**Doc. #20**] is **DENIED.**  Defendant's Motion to Affirm [**Doc. #23**] is **GRANTED.**

This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with order.  See Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days may preclude appellate review.  See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b); and D. Conn. L. Civ. R. 72.2; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).


Dated at Bridgeport, this 5th day of March 2015.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE