## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ———————————————— ) | |
| JONATHAN BORGOS-HANSEN, ) | |
| ) | |
| Plaintiff, ) | No. 3:13-cv-1857 |
| ) | |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN, ) | |
| COMMISSIONER, SOCIAL SECURITY ) | **JUNE 17, 2015** |
| ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ————————————————) | |

## RULING ON RECOMMENDED RULING OF MAGISTRATE JUDGE

**HAIGHT, Senior District Judge:**

Plaintiff Jonathan Borgos-Hansen filed this action against defendant Carolyn W. Colvin, Commissioner of the Social Security Administration ("the Commissioner"). Borgos-Hansen sued under §§ 205 (g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405 (g) and 1383(c)(3), to review the Commissioner's final decision denying plaintiff's claim for child's insurance benefits based on disability ("CIB") and supplemental security income ("SSI"), also based on disability. The Commissioner denied benefits to plaintiff on the ground that plaintiff was not disabled.

The Court referred the case to Magistrate Judge Holly B. Fitzsimmons for a recommended ruling ("RR") pursuant to 28 U.S.C. § 636(b)(1)(B). The case came before Judge Fitzsimmons on cross-motions. Plaintiff moved for an order reversing or remanding the decision of the Commissioner denying benefits. The Commissioner cross-moved to affirm that decision. The Commissioner's denial of benefits had the effect of affirming the conclusion of an Administrative

Law Judge ("ALJ") after a hearing that plaintiff was not disabled.  Judge Fitzsimmons filed an RR [Doc. 24] denying plaintiff's motion and granting that of the Commissioner.

The consequence of that recommendation, if accepted by this Court, would be to affirm the Commissioner's denial of all benefits.  Plaintiff, represented by counsel, filed timely objections to the RR under 28 U.S.C. § 636(b)(1).  Plaintiff contends that the denial of benefits was erroneous; that this Court should remand the case to the Commissioner with instructions to award benefits to the plaintiff; or, in the alternative, that the Court should remand the case with instructions to the Commissioner to enlarge the administrative record.  The Commissioner has not filed papers responding to those objections.

This Court has made "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  Having done so, the Court enters this Ruling, which resolves the questions arising out plaintiff's objections to the Magistrate Judge's Report and Recommendation.

## I.  LEGISLATIVE AND REGULATORY BACKGROUND

To be entitled to benefits under the Act, an individual must be "under a disability" as that termed is defined in the Act.  42 U.S.C. § 423(a)(1)(D).  An individual claiming to be "disabled" must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A).

It is relatively easy for the Congress to speak in general terms of "disability," "impairment" and "severity."  It is infinitely more difficult to apply those terms to an individual, prey to "the thousand natural shocks that flesh is heir to,"[1] and subject to the kaleidoscopic array of medically determinable causes, symptoms or syndromes that, alone or in combination, may afflict the human body and spirit.  In order to make the Social Security Act workable and its objectives reasonably attainable, the Social Security Administration ("SSA") has promulgated a five-step procedure for evaluating disability claims.  20 C.F.R. §§ 404.1520 and 416.920.  In *Rosa v. Callahan*, 168 F.3d 72 (2d Cir. 1999), Circuit Judge Sotomayor (as she then was) said:

> This Circuit has implemented that procedure as follows:
>
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

168 F.3d at 77 (brackets and ellipsis in original, citations omitted).

With respect, the description of the third inquiry in this quotation from *Rosa* is not entirely

---

[1]  *Hamlet*, Act III, I, 56.

accurate.  The third step of the five in the process is described in the SSA regulations as follows:

> At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that *meets or equals* one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4)(iii) (emphasis added).[2]  When the Second Circuit came in *Pratts v. Chater,* 94 F.3d 34 (1996), to describe the implementation of the five-step procedure, the court said:

> In this case, the ALJ found that Pratts (1) was not currently working; (2) had a severe impairment that significantly limited his ability to perform work; (3) was not presumptively disabled because his condition did not *meet or equal* the impairments listed in the regulations; and (4) could not perform his past work.  The present dispute concerns the fifth determination – whether there is other work that Pratts could do.

94 F.3d at 37 (emphasis added).

I have emphasized the phrase "meets or equals," as used in the regulation and by the Second Circuit in *Pratts,* because its plain language shows that in order to be declared disabled, an individual need not present with a condition that conforms exactly to a classic, medical-text-book case of an impairment listed in Appendix 1 to the regulations.  According to the SSA, the Appendix 1 Listing of Impairments "describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of

---

[2]  20 C.F.R. § 404.1520 *et seq.*, applies to "an application for a period of disability or disability insurance benefits (or both) or for child's insurance benefits based on disability."  20 C.F.R. § 404.1520 (2).  A parallel regulatory scheme, codified at 20 C.F.R. § 416.920 *et seq.*, applies to "an application for Supplemental Security Income disability benefits."  20 C.F.R. § 416.920 (2).  For present purposes, the two sets of regulations do not differ materially.  To avoid duplicative citation, I primarily cite to 20 C.F.R. § 404.1520 *et seq.* notwithstanding the fact that plaintiff's application for SSI is governed by 20 C.F.R. § 416.920 *et seq.*

his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) (hereinafter "the Listings"). However, in order to qualify as disabling, an impairment need not track precisely the Listings' description of a particular impairment. Under this wording, an individual is presumptively disabled if his or her condition, in terms of its severity, meets *or equals* that of a listed impairment. In consequence, and with respect, one cannot fully accept the paraphrase in *Rosa* that the third inquiry is whether "the claimant has an impairment which is listed in Appendix 1 of the regulations." The paraphrase omits the possibility that a claimant's impairment is sufficiently severe to *equal* a listed impairment, although it may not *meet* a listed impairment's particulars.

The concept of an impairment's *severity* can implicate medical or legal considerations, which can overlap in a fashion challenging to administrators and judicial officers. The SSA, in its regulatory definitions for Immune System Disorders, considered it helpful to say: "*Severe* means medical severity as used by the medical profession. The term does not have the same meaning as it does when we use it in connection with a finding at the second step of the sequential evaluation processes." 20 C.F.R. Ch. III § 14.00(C)(12).

## II.  FACTUAL BACKGROUND

The plaintiff in this case is Jonathan Borgos-Hansen. He was born on January 20, 1991. Borgos-Hansen has had a troubled medical history. On January 22, 2010, he filed with the SSA concurrent applications for CIB and SSI, alleging a disability beginning on January 20, 2006. The agency initially denied those applications. Plaintiff requested a hearing before an Administrative Law Judge.

On January 3, 2012, Borgos-Hansen appeared for a hearing before ALJ James E. Thomas. Borgos-Hansen was represented by counsel. The ALJ continued the hearing until May 31, 2012 for

the submission of additional medical records.  On June 28, 2012, the ALJ issued a decision adverse

to plaintiff.  Tr. 9-26.  The ALJ concluded that at the relevant times, Borgos-Hansen was not

disabled, and at the date of the ALJ's decision is not disabled, under the Act.  The SSA Appeals

Council denied plaintiff's request for review, a conclusion which became the final decision of the

Commissioner.  Plaintiff then commenced the captioned action in this Court.  Magistrate Judge

Fitzsimmons recommends that the Commissioner's decision be affirmed.  Plaintiff objects to that

recommendation.

The ALJ began his five-step evaluation procedure by finding with respect to the first step:

"The claimant has not engaged in substantial gainful activity since January 20, 2006, the alleged

onset date."  Tr. 14.  ALJ Thomas's decision then turns to the second step.  The ALJ reviewed

Borgos-Hansen's extensive medical record and stated in his decision: "Longitudinal records reveal

that the claimant has a complex medical history significant for Lupus.  Records reveal that in

January 2006 the claimant was diagnosed with and began treatment for Lupus," after presenting with

a number of indicative symptoms.  Tr. 16.  The ALJ further stated: "In addition to Lupus specific

treatment, the claimant has also received coinciding treatment for complaints of generalized

arthralgias secondary to his Lupus, first treating at Connecticut Children's Medical Center, and then

transitioning to Rheumatology Associates of Greater Waterbury."  Tr. 17.

Given this medical history, the ALJ answered the inquiry posed by the second step in the

five-step sequential process by finding:

> The claimant has the following severe impairment: Systemic Lupus
> Erythematosus (Lupus) with Generalized Arthritis.  (20 CFR
> 404.1520(c) and 416.920(c)).

Tr. 14.  The ALJ followed that finding with this comment:

> The medical evidence of record substantiates the above physical impairments.   These impairments cause more than minimal limitations in the claimant's performance of basic work activities and are considered severe.

> *Id*.

Lupus is a cruel affliction.  Regulations issued under the Act list lupus under the caption "Immune System Disorders," 20 CFR Part 404, Subpart P, Appendix 1, § 14.00, and define the disease in sobering terms, § 14.00(D)(1):

> Systematic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system.  It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss).  Major organ or body system involvement can include: . . . . immune system disorders (inflammatory arthritis).   Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

Claims of disability caused by lupus form the subject matter of numerous lawsuits filed under the Social Security Act.  *See, e.g.*, *Rohrbacher v. Colvin*, No. CV 14-4774, 2015 WL 1006678 (C.D.Cal. March 5, 2015); *Rockson v. Commissioner*, No. 13-cv-14486, 2014 WL 5421239 (E.D.Mich. Oct. 24, 2014); *James v. Astrue*, Civ. No. H-09-3634, 2010 WL 2985865 (S.D.Tex. July 27, 2010); *Vasquez v. Barnhart*, No. 02-cv-6751, 2004 WL 725322 (E.D.N.Y. March 2, 2004); and *Dowles v. Barnhart*, 258 F.Supp.2d 478 (W.D.La. 2003).  *See also Buis v. Colvin*, No. 1:13-cv-878, 2015 WL 566889 (S.D.Ind. Feb. 11, 2015) (claimant had severe impairments caused by rheumatoid arthritis, fibromyalgia and obesity).

While the ALJ's findings with respect to the first and second steps in the procedure militated in favor of a conclusion that plaintiff was disabled, the ALJ's ultimate decision, that Borgos-Hansen was not *entitled* to a finding of disability, is based principally upon the manner in which the ALJ

answered the third inquiry.  His decision states:

> The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

Tr. 15.  The ALJ added these words of explanation:

> The undersigned carefully considered all of the listed impairments, and, in particular, the 1.00 *Musculoskeletal System* Listings and the 14.00 *Immune System Disorders* Listings.  The medical evidence does not substantiate listing-level severity of the claimant's impairments, and no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

Tr. 15.

It is noteworthy that the wording of the ALJ's decision, consistent with the Court's regulatory construction stated *supra*, correctly poses the question as whether plaintiff's impairment or combination of impairments "meets or medically equals the severity" of a listed impairment, or whether the record contains medical findings "equivalent in severity to the criteria of any listed impairment."

Under the five-step procedure, then, a claimant may satisfy the second step by showing a *severe* impairment, but fail to satisfy the third step if the *severity* of that severe impairment does not meet or medically equal an impairment included in the Listings.  In *Rosa*, the Second Circuit described the procedure's implementation in such a circumstance:

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work the claimant could perform.

168 F.3d at 77.

In the case at bar, the ALJ further found that Borgos-Hansen had "the residual functional capacity to perform the full range of sedentary work" defined in the regulations, Tr. 15; the "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work," Tr. 19; and "there are jobs that exist in significant numbers in the national economy that the claimant can perform," Tr. 19.

Pursuant to the regulatory scheme, this combination of findings mandated the conclusion that plaintiff was not disabled under the Act.  ALJ Thomas duly entered a decision to that effect.

### III.  PLAINTIFF'S OBJECTIONS AND AN INTRODUCTION TO THE MEDICAL EVIDENCE

The brief for Borgos-Hansen [Doc. 25] in support of his objections to Judge Fitzsimmons's RR contends that the ALJ erred by concluding at the third step that "claimant does not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments."  The ALJ explained that conclusion by saying, in part, that he "carefully considered all of the listed impairments, and, in particular, the 1.00 *Musculoskeletal System* Listings and the 14.00 *Immune System Disorders* Listings."  Tr. 15.  I interpret plaintiff's objections and brief to focus solely upon the Immune System Disorders, of which lupus is one, and not upon the Musculoskeletal System.  Plaintiff's objection challenges the ALJ's conclusion that plaintiff was not disabled by lupus (SLE) and the "generalized arthritis" the ALJ found was present and secondary to lupus.  The discussion in plaintiff's brief is limited to section 14.00 of the Listings.[3]

_____

[3] The Court has been required to spend more time interpreting plaintiff's brief [Doc. 25] than it should because the brief, while spirited, is deficient in several regards.  Decided cases in other federal districts are referred to by name but without citations: *see* pages 2-4.  The discussion contains material in quotation marks with no indication of the source: *see, e.g.*, page 8.

9

I am commanded by the statute, 28 U.S.C. § 636(b)(1), "to make a de novo determination" of the Magistrate Judge's recommendation that the ALJ's decision in this regard should be approved. To that end, I have reviewed *de novo* the medical evidence in the administrative record of the hearing before the ALJ. A question of substance promptly arises. It is the ALJ's disregard of the opinions of a treating physician.

That treating physician is Beatrice Memet, M.D. Dr. Memet is board certified in rheumatology and internal medicine.[4] During the relevant times she was practicing as one of four physicians with the Rheumatology Associates of Greater Waterbury, Connecticut. The medical records show that on December 15, 2008, Borgos-Hansen appeared at that office "for a new patient appointment." The report of that visit recites: "Master Borgos Hansen presents for Rheumatologic consultation of systemic lupus erythematosus (SLE). He is referred by Dr. Edelheit, Pediatric Rheumatology." Tr. 422. Adriana Bianco, M.D., a member of the practice, saw and examined plaintiff on that occasion, and conducted the next few follow-up visits at various intervals. At one of these, on August 10, 2009, Dr. Bianco noted in her assessment: "Jonathan is a pleasant 18 year old high school graduate who has Systemic Lupus successfully managed with low dose Prednisone, Plaquenil and Cell Cept, as well as low dose ASA." Tr. 434.

On February 4, 2010, Borgos-Hansen was seen, apparently for the first time, by Dr. Memet, whose note states: "Patient presents for a followup visit. He has been previously seen by Dr. Bianco in August of 2009." Tr. 436. Dr. Memet's note of "Rheumatology History of Present Illness" described plaintiff as "a 19-year-old young man with a complex medical history significant for

---

[4] Information concerning these board certifications is available on the Internet. *See, e.g.*, http://certificationmatters.org (last visited June 15, 2015).

systemic lupuserythematosus," having been "diagnosed with SLE in January of 2006 when he presented with pancytopenia, constitutional symptoms including weight loss, fevers, and lymphadenopathy, as well as acute renal failure with proteinuria and microscopic hematuria. . . . A kidney biopsy was obtained and revealed active Class 4 lupus nephritis."  Tr. 436.  Dr. Memet's "General Assessment" was: "Jonathan has systemic lupus erythematosus with Class 4 lupus nephritis, quiescent on current regimen . . . " Tr. 438.

Dr. Memet saw Borgos-Hansen frequently throughout 2010 and 2011, often at six-week intervals.  As noted, when plaintiff first appeared for his hearing before ALJ Thomas in January 2012, his counsel asked for a continuance in order to collect additional medical proof, a request the ALJ granted.  That additional medical proof included opinions by Dr. Memet which counsel submitted in the form of questionnaires counsel prepared and Dr. Memet completed, signed and dated on February 2 and February 3, 2012.  The completed questionnaires, Tr. 865-876, were submitted at the continued hearing before the ALJ on May 31, 2012.

These questionnaires are comprised of printed questions which the physician answers by checking a "No" or "Yes" format, or tables which the physician completes by checking one of several choices.  The first type of question is illustrated by the first line of a questionnaire found at Tr. 865.  The form poses the question: "Has patient had widespread pain in all four quadrants of the body for a minimum of three months?"  The physician responds by checking a "No" box or a "Yes" box.  The second type appears on another questionnaire, Tr. 866.  An enclosed printed space is captioned "LIFTING/CARRYING."  There are five columns.  The left-hand column is captioned "Lift," under which four alternative amounts are listed on separate lines: "A. Up to 10 lbs; B. 11 to 20 lbs; C. 21 to 50 lbs; D. 51 to 100 lbs."  Each line is followed by four spaces, captioned "Never";

"Occasionally"; "Frequently"; and "Continuously."  The questionnaire asks the responder to "Check the boxes representing the amount the individual can <u>carry</u> and how often it can be carried."  The physician responds by checking the appropriate boxes.

These questionnaires, prepared by an attorney representing a client claiming social security benefits, resemble the true-false section of a bar examination rather than the essay section.  Nonetheless, the questions themselves are straightforward and do not suggest desired answers.  A physician who checks one box or another is, by that action, expressing a medical opinion.  The questionnaires in evidence, Tr. 865-876, completed by Dr. Memet, constitute the medical opinions she formed about the condition on Jonathan Borgos-Hansen during the two years she was his principal treating physician.  Everyone concerned in the case recognizes that these responses are medical opinions.  ALJ Thomas said in his decision: "I have also considered the *opinion* of Dr. Memet proffered on February 3, 2012. (Exhibit 19F)."  Tr. 18 (emphasis added).  "Exhibit 19F" is the single exhibit number given at the hearing to the collection of questionnaires comprising Tr. 865-876.  Judge Fitzsimmons said in her RR that "Dr. Memet *opined*, in pertinent part, that plaintiff has" the several conditions listed in a questionnaire answer, Tr. 876.  RR at 42 (emphasis added).

One can transpose Dr. Memet's answers to these questionnaires and restate them in the more familiar form of medical opinions, without altering their substance.  Judge Fitzsimmons undertook that task in her RR, which reads in part:

> Dr. Memet also opined that plaintiff can occasionally reach and handle with both hands, but can never finger, feel, push/pull, or operate foot pedals. (Tr. 868). Dr. Memet further found that plaintiff has full postural limitations, in that he can never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch or crawl. (Tr. 869).  She also opined that plaintiff has total environmental limitations and can never be exposed to unprotected heights, vibrations, extreme heat and cold, and pulmonary irritants, among

others. (Tr. 869). Dr. Memet also notes that plaintiff can shop, walk a block and climb a few steps at a reasonable pace, and sort/handle files, but with pain. (Tr. 870). With respect to each of the aforementioned findings, Dr. Memet affirmatively notes that medical or clinical findings supporting these assessments are contained in her medical records. (Tr. 867-70). Finally, Dr. Memet concludes by stating that chronic pain is produced by plaintiff's condition(s); plaintiff's sleep is routinely disrupted from pain; plaintiff experiences chronic fatigue; fatigue, weakness or pain are significant factors in functional loss; pain interferes with sustaining concentration and attention throughout eight hours; persistence and pace are impaired; plaintiff experiences side effects from his medications; pain and fatigue contribute to anxiety and depression; and that loss of function interferes with plaintiff's activities. (Tr. 871).

Finally, Dr. Memet also completed a questionnaire dated February 3, 2012, that is tailored to Listings 14.09 (inflammatory arthritis) and 14.02 (Lupus). (Tr. 872-76). She opined that plaintiff's condition has been documented by his medical history, clinical findings and examinations, selected laboratory studies, and plaintiff's responses to treatment, therapy and/or medications. (Tr. 872). She also stated plaintiff has a history of joint pain, swelling and tenderness (Tr. 872), and that his impairment has joint involvement and various muscle involvement. (Tr. 874). Dr. Memet further notes that plaintiff has significant documented constitutional symptoms of fatigue and malaise. (Tr. 875); see also Tr. 876 (affirmatively answering that plaintiff exhibits repeated manifestations of Lupus and two or more constitutional symptoms or signs). She also states there is kidney involvement. (Tr. 875). Finally, Dr. Memet noted that during a flare of his condition, plaintiff has experienced marked limitation of activities of daily living, maintaining social functioning, and timely completing tasks due to deficiencies in concentration, persistence or pace. (Tr. 876).

RR at 19-21.

This is an accurate summary of the several impairments and limitations Dr. Memet listed in response to the questionnaires. While the questionnaires Dr. Memet completed do not use the noun "disability" or the adjective "disabled," it seems apparent from her answers that in Dr. Memet's opinion Borgos-Hansen suffers from an impairment or combination of impairments that meets or

13

medically equals the severity of one of the impairments in the Listings: specifically, systemic lupus erythematosus.[5]  When we turn to the regulatory Listings, we find that section 14.02 lists the first of several "Immune System Disorders" as follows:

> *Systemic lupus erythematosus*.  As described in 14.00D1.  With:
> A.  Involvement of two or more organs/ body systems, with:
>     1.  One of the organs/body systems involved to at least a moderate level of severity; and
>     2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
>
> or
>
>     B.  Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>     1.  Limitations of activities of daily living.
>     2.  Limitations in maintaining social functioning.
>     3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

This and other listings are preceded by regulatory definitions and explanatory remarks, one of which (¶ 5) reads in part:

> When "marked" is used as a standard for measuring the degree of functional limitation, it means more than moderate but less than extreme. . . .  You may have a marked limitation when several activities or functions are impaired, or even when only one is impaired.  Also, you need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation seriously interferes with your ability to function independently, appropriately, and effectively.  The term "marked" does not imply that you must be confined to bed, hospitalized, or in a nursing home.

No one could seriously contend that placing a particular individual within or without these

---

[5]  It is nowhere disputed that plaintiff has since childhood been diagnosed with systemic lupus erythematosus (or SLE).

intricate and overlapping boundaries and definitions is always easy.  But it does seem clear that, given Dr. Memet's specific medical opinions as recounted *supra*, Borgos-Hansen's conditions and impairments bring him within the Listing of lupus.  However, in his application for social security benefits, Dr. Memet's opinions availed Borgos-Hansen nothing.  That is because the ALJ chose to disregard Dr. Memet's opinions entirely, and the Magistrate Judge approved his doing so.

The ALJ's decision deals in a brief dismissive paragraph with the questionnaires Dr. Memet completed:

> I have also considered the opinion of Dr. Memet proffered on February 3, 2012.  (Exhibit 19F).[6]  I have accorded this opinion no weight as it is not supported by diagnostic imaging or by Dr. Memet's own treatment records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment.

Tr. 18.  The Magistrate Judge quoted that passage from the ALJ's decision, reviewed some of the medical evidence, and said:

> If the treating physician's opinion is not supported by objective medical evidence or is inconsistent with other substantial evidence in the record, the ALJ need not give the opinion significant weight.  *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009).
>
> For the reasons already stated, the Court concludes there is substantial evidence to support the ALJ's decision that Dr. Memet's opinions were inconsistent with the record as a whole and not entitled to controlling weight.

RR at 44.

Plaintiff's Objection [Doc. 25] to the RR specifically challenges the ALJ's rejection of the opinions voiced by Dr. Memet, a treating physician:

---

[6]  In fact, Exhibit 19F at the hearing consists of three questionnaires completed and signed by Dr. Memet.  The first is dated February 2, 2012.  Tr. 865.  Each of the last two is dated February 3, 2012 (Tr. 866-871 and Tr. 872-876).

15

> His [Borgos-Hansen's] treating physician not only recorded this constitutional sign or symptom [fatigue] but also expressly opined that Mr. Borgos-Hansen suffers significant fatigue **secondary to SLE**. There is no reason why the treating physician rule should not apply here, and no explanation as to why the evidence of fatigue is invalid. . . .
>
> Here, a board certified treating physician opined that with "stable low double dsDNA" and more active urinary sediment with moderate blood and increased protein" meant that SLE was severe. It was improper for the ALJ to disagree and express a contrary opinion.

Doc. 25 at 2, 9.

In arriving at the conclusions expressed in this Ruling, I must consider *de novo* whether the record sustains plaintiff's objection that the ALJ's decision violated what has come to be known through frequent invocation, regulatory provision and judicial opinions as "the treating physician rule."

### IV.  THE TREATING PHYSICIAN RULE AND THE OBLIGATION OF AN ADMINISTRATIVE LAW JUDGE TO FURTHER DEVELOP THE RECORD

Prior to 1991, Second Circuit case law "established a so-called 'treating physician rule' giving substantial weight to the treating physician's opinion as against other medical evidence." *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing cases).  In 1991, the SSA promulgated new regulations "which set forth criteria for weighing treating physician opinions in disability cases." *Id*.  The Second Circuit's opinion in *Schaal* quotes the SSA's 1991 regulations:

> *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources. . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to be given the opinion.

16

134 F.3d at 503 (material in brackets in original). *Schaal* goes on to say:

> The various factors applied when the treating physician's is not given controlling weight include: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors.

*Id*. In *Schaal* the Second Circuit made it plain that these are factors "that the ALJ is required to address under the 1991 Regulations when the treating physician's opinion is *not* given controlling weight." 134 F.3d at 504 (emphasis added). It follows that the ALJ must discuss the relevant factors in his or her decision, since Judge Cabranes's opinion in *Schaal* took pains to note that "the 1991 Regulations provide that the Commissioner 'will always give good reasons in our notice of determination or decision for whatever weight we give [claimant's] treating source's opinion.'" *Id*. at 503-504. In the case at bar, the ALJ's decision did not discuss these factors as bearing upon the weight to be given Dr. Memet's treating-physician opinions.[7]

The Second Circuit has had numerous occasions to consider the treating physician rule as delineated in the 1991 SSA regulations. *Rosa v. Callahan*, 168 F.3d 72 (2d Cir. 1999) is one of those cases. Judge Sotomayor declared these principles:

> The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence. In analyzing a physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. A circumstantial critique by a non-physician, however thorough or responsible, must be overwhelmingly compelling to justify a denial of benefits. In this case, however, the ALJ did exactly that.

---

[7] The SSA's 1991 Regulations, which the Second Circuit discussed in *Schaal*, have been somewhat revised for publication in the current CFR (as of April 1, 2014), but the relevant provisions are not materially different from those quoted in text.

168 F.3d at 78-79 (citations and internal quotation marks omitted).  One of the ALJ's transgressions in *Rosa* was to emphasize that Dr. Ergas, the treating physician who opined that the claimant was disabled, "'did not report findings of muscle spasm to corroborate any loss of motion.'"  *Id.* at 79.  The Second Circuit was blunt in its criticism of that ALJ's non-disability decision:

> Indeed, as a lay person, the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment. Accordingly, we find nothing so "overwhelmingly compelling" in the ALJ's critique of Dr. Ergas's findings as to permit the Commissioner to overcome an otherwise valid medical opinion.

*Id.* (citation and some internal quotation marks omitted).

In *Schaal*, a physician named Jobson began treating the claimant on October 29, 1992 and completed a questionnaire describing his medical condition on May 28, 1993.  The questionnaire was submitted to the ALJ at a hearing.  The ALJ "apparently assigned little or no weight to Dr. Jobson's opinion as a treating physician.  The ALJ cited two reasons for discounting Dr. Jobson's opinion.  First, he concluded that the questionnaire completed by Dr. Jobson 'is not a statement of the treating physician binding on me because of the lack of clinical findings to support these conclusions.'"  134 F.3d at 504 (footnote omitted).  The Second Circuit does not accept that as a sufficient ground for rejecting the opinion of a treating physician, even one expressed in a questionnaire.  Judge Cabranes said in *Schaal* that "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson *sua sponte*."  *Id.* at 505.

An ALJ's duty to further develop the administrative record is an established principle of Second Circuit jurisprudence.  In *Rosa v. Callahan*, Judge Sotomayor summed up the concept:

> One of our recent opinions [citing *Schaal*] confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.  "Even

> if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*." [quoting *Schaal*]. If an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to eke out more information from the treating physician and to develop the administrative record accordingly.   In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal.   It is the rule in our circuit that the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.   This duty exists even when the claimant is represented by counsel.

168 F.3d at 79 (some citations and internal quotation marks omitted).  The *Rosa* court went on to state:

> the flip side of this proposition.   Specifically, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a compete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.

168 F.3d at 79 n. 5 (citation and internal quotation marks omitted).

More recently, the Second Circuit has said:

> The ALJ's duty to develop the record reflects the essentially non-adversarial nature of the benefits proceeding.   It is the AJ's duty to investigate the facts and develop the arguments *both for and against* granting benefits.

*Swiantek v. Commissioner*, 588 Fed.Appx. 82, 83-84 (2d Cir. 2015) (emphasis added).  *See also*

*Vasquez v. Barnhart*, No. 02-CV-6751, 2004 WL 725322 (E.D.N.Y. March 2, 2004) ("The ALJ

erred in failing to elicit further written or oral testimony from plaintiff's treating physicians as to the

nature and extent of plaintiff's impairment.") (citing Second Circuit cases, including *Schaal*).

## V.  THE ADMINISTRATIVE LAW JUDGE'S REJECTION OF THE OPINIONS OF DR. MEMET, A TREATING PHYSICIAN

The case at bar presents the question of whether this Court should remand the denial of benefits to the Commissioner with instructions that the ALJ further develop the record, principally for the purpose of eliciting further evidence from Dr. Memet, Borgos-Hansen's treating rheumatologist.  Under the principles articulated by the Second Circuit in *Rosa*, this Court should order such a remand if there are "clear gaps" in the administrative record, but need not do so "if there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history."  *Rosa v. Callahan*, 168 F.3d at 79.

In addressing that inquiry, I focus upon on what the ALJ said in his decision denying benefits,  rather than upon what the Magistrate Judge said in her recommendation that the Court accept the ALJ's decision.  That is the practical consequence of a district court's mandated *de novo* review of a claimant's objections to a recommended ruling that would deny benefits.  To perform a review *de novo*, a District Judge reviews the relevant evidence in the administrative record from scratch (a slang rendition of the more elegant Latin phrase) and decides whether *the ALJ'*s reasoning passes muster under Second Circuit authority.  "In reviewing the denial of [Social Security] benefits by the [Commissioner], our focus is not so much on the district court's ruling as it is on the administrative ruling."  *Schaal v. Apfel*, 134 F.3d 496, 500-501 (2d Cir. 1998) (citation and internal quotation marks omitted).  The court of appeals' focus upon "the administrative ruling" (that is to say, the ALJ's decision) is simply an implementation, albeit at a higher level, of the same *de novo* review the statute commands the district court to make in evaluating objections to a denial of benefits.

In the case at bar, ALJ Thomas's decision properly recognizes that Dr. Memet was a treating physician for Borgos-Hansen.  His decision also manifests the ALJ's awareness that, under the SSA

regulations and Second Circuit precedent, he was required to state his reasons for rejecting opinions expressed by Dr. Memet which, had they been accepted, would have satisfied the third step in the five-step evaluation process and entitled plaintiff to disability benefits.  An ALJ's obligation to explain his reasons for disregarding a treating physician's opinion is taken seriously by the Second Circuit, as that court explained in *Snell v. Apfel*, 177 F.3d 133-134 (2d Cir. 1999), an opinion by Judge Calabresi.  *Snell* acknowledges that a regulation "relieves the Social Security Administration of having to credit a doctor's finding of disability,"

> but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and [20 CFR] ¶ 404.1527(d)(2), to explain why a treating physician's opinions are not being credited.  The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even —  and perhaps especially — when those dispositions are unfavorable.  A claimant like Snell, who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy  that she is not, unless some reason for the agency's decision is supplied.  Snell is not entitled to have Dr. Cooley's [her treating physician's] opinion on the ultimate question of disability be treated as controlling, but she is entitled to be told why the Commissioner has decided — as under appropriate circumstances is his right — to disagree with Dr. Cooley.

177 F.3d at 133-134 (one citation omitted).

The ALJ's reasons for rejecting the opinion of Dr. Memet, a treating physician and board-certified specialist (rheumatology and internal medicine), are stated  in a single sentence in the ALJ's decision, which says: "I have accorded this opinion no weight as it is not supported by diagnostic imaging or by Dr. Memet's own treating records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment."  Tr. 18.

I note *supra* that the opinion Dr. Memet expressed, and the ALJ rejected for the reasons just quoted, related to the **fourth** step in the five-step process, namely, Borgos-Hansen's residual

functional capacity ("RFC").  However, plaintiff's objections before this Court relate to the **third** step: the severity of the lupus condition which everyone agrees Borgos-Hansen had contracted in childhood.  The ALJ's reason why plaintiff failed at the third step is stated more broadly: "The medical evidence does not substantiate listing-level severity of the claimant's impairments, and no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." Tr. 15.  That reasoning expands upon the ALJ's subsequently expressed criticism that Dr. Memet's opinion about plaintiff's RFC is not supported "by Dr. Memet's own treatment records"; in this earlier articulation, perceived omissions in the findings of other "treating or examining" physicians are also singled out by the ALJ.

Assuming for the sake of this discussion that the opinions of Dr. Memet the SLJ rejected apply to both steps three and four, I must conduct a broader *de novo* consideration of the ALJ's reasons for giving Dr. Memet's opinion no weight.  That is because, under the Second Circuit's holding in *Rosa*, the opinion of a treating physician "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d at 79.  Moreover, in such a case, where the opinion of a treating physician militates in favor of an award of benefits, the "circumstantial critique" of the ALJ, "a non-physician, however thorough or responsible, must be *overwhelmingly compelling* to justify a denial of benefits." *Id.* at 78-79 (emphasis added).

I begin my consideration of the ALJ's reasons for rejecting Dr. Memet's opinion with the observation that to the extent the ALJ's reasoning is based upon his view that Dr. Memet's opinion "is not supported by diagnostic imaging," the ALJ's rejection of this treating physician's opinion for that reason is problematic under Second Circuit authority.  I noted *supra* that in *Schaal,* 134 F.3d

at 505, Judge Cabranes said that "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson*s* [a treating physician] s*ua sponte.*" *Schaal v. Apfel*, 134 F.3d at 505.  That is the sort of "additional information" which is routinely obtained during a remand of a security benefits case from a district court to the Commissioner for further development of the record.  *See, e.g., Leroy v. Colvin*, No. 3:13-cv-922, 2015 WL 499568 (D.Conn. Feb. 6, 2015), at *10 (case remanded where " the ALJ's terse explanation for her disregard of Dr. Shahid's opinion that Leroy 'remains disabled' is inadequate as a matter of law.").

The more substantive reason the ALJ gives for giving Dr. Memet's opinion no weight is its lack of support "by Dr. Memet's own treatment records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment."  Tr. 18.  The ALJ extends that criticism to the records of other physicians who treated or examined plaintiff, which in the ALJ's view omit any findings of degrees of impairment severity sufficient to satisfy step three.

On this aspect of the inquiry, I accept in principle the proposition that medical records may be so devoid of notations consistent with, or contain notations so contrary to, a treating physician's opinion concerning the existence or severity of an impairment that the records become "overwhelmingly  compelling," to borrow Judge Sotomayor's phrase in *Rosa*  — compelling, that is to say, an ALJ's conclusion that a treating physician's opinion should be accorded no weight whatsoever and denying benefits in consequence.  It is a strong showing that must be made in principle to justify throwing a treating physician's opinion away.  The question is whether that showing has been made in practice on the evidence in this case.

If the administrative record fails to justify the ALJ's rejection of the treating physician's opinion in this case (which would otherwise be controlling), this Court's options are to remand the

case to the Commissioner with instructions to calculate and pay plaintiff's benefits, or to remand the case with instructions to further develop the record.  The Second Circuit summarized those options in *Rosa*:

> Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.  In other situations, where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.

168 F.3d at 82-83 (citations, internal quotation marks, and footnote omitted).  The Second Circuit's delineation of a court of appeals' options mirrors those options available to a district court at this earlier stage of the litigation.

As an unbroken line of Second Circuit cases demonstrates, a court may in appropriate circumstances exercise either remand option without exceeding the limitations on the court's authority in social security benefits cases.  "It is not our function to determine *de novo* whether [a plaintiff] is disabled.  Rather, we set aside an ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.  Whether an ALJ who rejects a treating physician's opinion in a manner which violates Second Circuit decisions articulating the treating physician rule commits a legal error, or reaches a decision not supported by substantial evidence, or is guilty of both these cardinal sins, makes no difference.  The present point is that a court, having considered a claimant's objections to an adverse decision and reviewed the relevant evidence *de novo*, has the authority to remedy a breach by an ALJ of the treating physician rule if the evidence shows that such a breach occurred.

The unquestionable substance of the opinion expressed by Dr. Memet, plaintiff's treating

board-certified rheumatologist, is that Borgos-Hansen's combination of impairments and conditions

satisfied the requirements of the third step of disability evaluation, entitling Borgos-Hansen to a

finding he was disabled as a matter of law.  To be sure, Dr. Memet did not state that proposition in

so many words.  Instead, she completed a series of questionnaires by answering medical questions:

a familiar practice in disability cases.  Dr. Jobson, plaintiff's treating physician in *Schaal*, completed

a questionnaire that Judge Cabranes's opinion describes thus:

> The questionnaire consisted of a series of questions, followed by
> spaces for "yes" or "no" check marks.  This was the same format used
> in the forms filled out by Drs. Mokotoff and Mandell, except that
> instead of requesting a separate written explanation of the "yes" or
> "no" answers, Dr. Jobson's questionnaire simply asked whether as a
> general matter the physician's diagnosis was "confirmed by medical
> signs and findings established by medically acceptable clinical or
> laboratory diagnostic techniques."[8]  By checking "yes" on the form
> Dr. Jobson indicated that plaintiff *was disabled based on objective*
> *medical findings*, that she would have trouble working six hours per
> day without intermittent breaks, that she would have to alternate
> between sitting and standing, and that it would be reasonable to
> expect that her symptoms would result in frequent absences from the
> workplace.  By checking "no" he indicated that she would not have
> to lie down and rest during an eight-hour work day and that there was
> no manifestation of "increased nervousness, depression or anxiety."

134 F.3d at 499-500 (emphasis added).

    The questionnaires Dr. Memet completed in the case at bar follow the same format and arrive

at the same conclusion.  The ALJ quite correctly interpreted them as expressing Dr. Memet's opinion

that Borgos-Hansen should be classified "disabled" after the third step of the procedure.  That is

---

[8]  The questionnaires completed by Dr. Memet in this case contain comparable language.
*See, e.g.*, Tr. 867: "Are particular medical or clinical findings (i.e., physical examination findings,
x-ray findings, laboratory test results, history, and symptoms including pain etc.) supporting your
assessment contained in your medical records?"  Dr. Memet checked the "yes" box following that
question on each of the questionnaires in the record.

why, in order for the ALJ's decision to conclude that plaintiff was *not* disabled, it was necessary for the ALJ to say of Dr. Memet's opinion that "I have accorded this opinion no weight," Tr. 18, preceding that specific rejection with the more general statement: "The medical evidence does not substantiate listing-level severity of the claimant's impairments, and no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." Tr. 15.

What then, of the medical evidence, and its relation to Dr. Memet's opinion that Borgos-Hansen was disabled?  I begin with a detailed description of the impairment of systemic lupus erythematosus ("lupus" or "SLE") and the numerous afflictions lupus can visit upon an individual unfortunate enough to suffer from it.  In order to search through medical records for evidence of a disease's manifestations and severity, it is useful to know at the outset what we are looking for. Here, the disease is lupus.  I have limited  the search to evidence of lupus's "manifestations and severity" in Borgos-Hansen's case because the ALJ found, on the medical evidence, that plaintiff "has the following severe impairment: Systemic Lupus Erythematosus (Lupus) with Generalized Arthritis." Tr. 14.  That finding satisfies step two.  "When, as here, the ALJ has determined at the second step of the analysis that the claimant has" an impairment of sufficient severity to limit his physical or mental ability to do basic work activities, the ALJ "must then determine whether the impairment or impairments 'is listed in Appendix 1 or is equal to a[ny] listed impairments'; if so, the claimant will be found presumptively disabled." *Vasquez v. Barnhart*, 2004 WL 725322, at *6 (citing regulations).  That is step three.[9]  The prerequisite of a step three listed impairment or its

---

[9] In the CFR, the SSA includes this useful guidance for disability benefits claimants: "If you have a severe medically determinable impairment(s) that does not meet a listing, we will determine whether your impairment(s) medically equals a listing.  If it does not, you may or may not have the

equivalent is determined by a disease's severity, not its presence.  In this case, the *presence* of Borgos-Hansen's disease constituting a "severe impairment" was established at step two.  The disease is systemic lupus erythematosus, a/k/a SLE.

Another district court has quoted a description of SLE promulgated by the Department of Health and Human Services, National Institutes of Health.  *See Dowles v. Barnhart*, 258 F.Supp.2d 478 (W.D. La. 2003), where the following governmental profile of lupus appears at 481 n. 3:

> Systemic Lupus Erythatosus ("SLE") is a disorder of the immune system known as an autoimmune disease in which the body harms its own healthy cells and tissues, leading to inflammation and damage to various body tissues.  The cause of lupus is unknown and there is no cure for lupus, but it can be successfully treated with drugs. Lupus can affect the joints, skin, kidneys, heart, lungs, blood vessels, and brain.  Common symptoms include extreme fatigue, painful or swollen joints (arthritis), muscle pain, unexplained fever, red skin rashes (usually on the face), kidney problems, chest pain upon deep breathing, unusual hair loss, pale or purple fingers or toes from cold or stress (Raynaud's phenomenon), sensitivity to the sun, edema in legs or around eyes, and swollen glands.  Lupus is characterized by periods of illness, called flares, and periods of wellness, or remission. The warning signs of a flare are increased fatigue, pain, rash, fever, abdominal discomfort, headache and dizziness.
>
> Systemic lupus erythematosus means the disease can affect many parts of the body. . . . Body systems can also be affected by lupus, as follows: (1) kidneys — inflammation of the kidneys (nephritis) can impair their functioning, (2) lungs — develop pleuritis, an inflammation of the lining of the chest cavity which causes pain, particularly with breathing, and may develop pneumonia, (3) brain or central nervous system — causes headaches, dizziness, memory disturbances, vision problems, stroke, or changes in behavior, (4) blood vessels — vessels may become inflamed (vasculitis), affecting the way blood circulates through the body, (5) blood — may develop anemia, leukopenia (a decreased number of white blood cells),

---

residual functional capacity to engage in substantial gainful activity.  Therefore, we proceed to the fourth, and if necessary, the fifth steps of the sequential evaluation process."  20 CFR Parts 400 to 499 (April 1, 2014) at 531.

thrombocytopenia (a decreased number of platelets), or abnormalities which cause an increased risk for blood clots, and (6) heart — inflammation may occur in the heart itself (myocarditis and endocarditis) or the membrane that surrounds it (pericarditis), causing chest pain or other symptoms, and can increase the risk of atherosclerosis.

This, then, is the medical and regulatory description of the nature and myriad potential effects of systemic lupus erythematosus, that "severe impairment" which (together with "generalized arthritis") the ALJ found was afflicting Jonathan Borgos-Hansen.  Upon what medical evidence with respect to plaintiff's treatment for that disease did the ALJ conclude that plaintiff was not disabled?

The ALJ's decision denying benefits is based *au fond* upon his  perception that Dr. Memet's opinion with respect to the severity of Borgos-Hansen's lupus is not supported by entries in "Dr. Memet's own treatment records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment," Tr. 18, or by findings in the records or those of other physicians who treated or examined Borgos-Hansen.  I am required to consider the relevant medical records *de novo*.  These sources will be considered separately.

1.      **Dr. Memet's Records**

According to the documents contained in the administrative record, during the time prior to Dr. Memet's completion in February 2012 of the questionnaires previously described, she conducted office examinations of Jonathan Borgos-Hansen on ten separate dates: February 4, 2010; March 25, 2010; May 3, 2010; August 20, 2010; November 30, 2010; January 13, 2011; April 18, 2011; September 8, 2011; October 20, 2011; and December 1, 2011.  The ALJ's decision and the Magistrate Judge's recommended ruling each purport to recite Dr. Memet's findings and assessments during the course of those office visits.

28

The ALJ discussed Dr. Memet's treatment records within the context of determining Borgos-Hansen's residual functional capacity (RFC), a component of the fourth step in the five-step process. Tr. 15-19.  On that particular question, the ALJ found that "the claimant has the residual functional capacity to perform the full range of sedentary work" as defined in the applicable regulations.  Tr. 15.  The ALJ cites notations in Dr. Memet's records that Borgos-Hansen is "doing well" or "doing well overall" as a basis for deciding to give Dr. Memet's opinion "proffered on February 3, 2012" no weight, as it is not supported "by Dr. Memet's own treatment records, which reveal essentially normal findings, and improvement in the claimant's condition with treatment."  Tr. 18.

It should be noted that the ALJ's explicit rejection of an opinion expressed by Dr. Memet occurs entirely within the context of the ALJ's appraisal of the plaintiff's residual functional capacity.  Dr. Memet's opinion "proffered on February 3, 2012" is presumably a reference by the ALJ to a six-page questionnaire signed by Dr. Memet on that date (Tr. 866-871) which is captioned: "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."[10]  An ALJ's evaluation of a claimant's RFC comes at the **fourth** step in the process.  Plaintiff's principal contention on the objections in the case at bar is that the ALJ erred at the **third** step when he found that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the regulations.  Tr. 15.  As to that third step, the ALJ's decision says only: "The medical evidence does not substantiate listing-level severity of the claimant's impairments, and no treating or examining physician has mentioned

_____

[10] Dr. Memet completed and signed two other questionnaires at about that time, one dated February 2, 2012 (Tr. 865) and the other February 3, 2012. (Tr. 872-876.).  Both questionnaires required Dr. Memet to give medical answers with respect to Borgos-Hansen's diagnoses and symptoms.  They do not appear to be what ALJ Thomas had in mind when he rejected Dr. Memet's opinion in the manner quoted in text.

findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  The ALJ's particular explanation for this step-three finding does not extend beyond that one-sentence dismissal of all physicians' records, be they treating, consulting, or agency-retained physicians.

The distinction between the third and fourth steps is significant, since if a claimant carries his burden on step three, the inquiry is at an end.  The claimant is deemed disabled.  Questions of his residual functional capacity and work availability do not arise.  The agency states the proposition succinctly in its regulations:

> If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.
>
> If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record.

20 CFR § 404.1520(d), (e).

Reverting to Dr. Memet's medical records, the ALJ's decision contains repeated references to Dr. Memet's notations that on the occasion of one examination or another, Borgos-Hansen was "doing well" or "doing well overall."  Tr. 17.  Such a generalized description of a patient, while reassuring and favorable as far as it goes, does not preclude a finding that the patient is disabled by a listed impairment.  *See Vasquez v. Barnhart*, 2004 WL 725322, at *9: "Nor does the fact that this chronic, incurable condition [SLE] was characterized as 'stable' mean that it cannot constitute a disability under the Listing, as defendant suggests."  For that proposition Judge Ross cited *Dowles v. Barnhart*, 258 F.Supp.2d 478, 489 (W.D. La. 2003) ("finding that discoid lupus, even when

treated with appropriate medication, meets definition of skin involvement under Listing 8.00, incorporated in Listing 14.02)."

Dr. Memet's medial records, generated by her ten office examinations of Borgos-Hansen over spread over two years, are lengthy, comprehensive and detailed.  I am not certain that the ALJ's selected quotations from these records do them full justice.  To these lay eyes (a limitation shared by the ALJ and the Magistrate Judge), Dr. Memet's records seem to demonstrate a worsening in the plaintiff's lupus and its related complications.

During her first examination of plaintiff, on March 5, 2010, Dr. Memet recited as part of Borgos-Hansen's history: "He has on and off pain in his knees and lower back which seems to be chronic."  Tr. 440.  Dr. Memet's "general assessment" at that time specified lupus and: "Possible secondary fibromyalgia in the setting of chronic musculoskeletal complaints."  Tr. 442. Dr. Memet's treatment plan at the conclusion of that first examination stated in part: "The pain seems to be controlled with the current regimen with Tramadol and Naproxen.  I would avoid adding more medications at this time."  Tr. 439.

During her most recent examination of plaintiff, on December 1, 2011, Dr. Memet's noted history stated:

> Jonathan returns today for a follow-up visit for systemic lupus.  He is overall doing well, although he complains of worsening diffuse body pain.  He has pain in the upper back, shoulders, hips, lower back, knees which has been getting worse as the weather has become cooler.  He denies joint swelling or stiffness.  He is not exercising because the joints and legs hurt.  He has an interrupted sleep pattern and he feels tired and fatigued.

Tr. 707.  Dr. Memet's assessment changed "possible secondary fibromyalgia" to a more positively stated "Fibromyalgia," Tr. 109.  Her treatment plan, in addition to treatment for lupus, specifies

treatment for: "Fibromyalgia, depression. Chronic, diffuse pain." *Id*. Fibromyalgia and depression

were not singled out as conditions requiring treatment in Dr. Memet's first assessment. The most

recent assessment changes and increases medication: in that regard, Dr. Memet says:

> I will start him on a low dose Amitriptyline at bedtime; hopefully will improve the sleep pattern, depression and fibromyalgia. He might benefit from starting on SSRI or SNRI which he would like to discuss with the psychiatrist.[11]
>
> Change pain medication, discontinue Tramadol and start him on Tylenol with Codeine. Potential side effects discussed with the patient including the risk for sedation, constipation and addiction. He will monitor the Coumadin level closely.

Tr. 710.

It is difficult to discern, in a comparison of these two bookend treatment records, a patient

maintaining the benign level of "doing well" over this crucial period of time. To my untrained and

medically unprofessional eye, Borgos-Hansen seems to be getting worse. Moreover, his "overall"

condition may be deteriorating for clinically recognized causes: the debilitating effect of systemic

lupus erythematosus, an autoimmune disease for which no cure is known and can adversely affect

multiple body parts and systems, characterized by periods of illness and wellness, and frequently

resulting in the secondary conditions of arthritis, fibromyalgia, depression, and fatigue. These are

conditions and symptoms that Borgos-Hansen has complained of at one time or another during his

treatment by Dr. Memet.

## 2.    Other Medical Records

Borgos-Hansen first appeared for a hearing before ALJ Thomas in January 2012. In

---

[11] Dr. Memet's treatment notes reflect that at one point Borgos-Hansen indicated a possible interest in consulting a psychiatrist. The record does not reflect whether or not he did so.

addition to Dr. Memet, Borgos-Hansen had seen a number of other physicians during the preceding years. That is not surprising, since as the ALJ found, "in January 2006 the claimant was diagnosed with and began treatment for Lupus." Tr. 16. The ALJ's decision discusses the medical reports of other treating or examining physicians at Tr. 16-18. The Magistrate Judge discusses the "medical evidence" at RR 9-27: a detailed review of records generated by physicians privately retained by plaintiff's family at one time or another over the years, and by physicians and investigators appointed by the SSA in response to plaintiff's application for disability benefits.

This Ruling does not analyze these other sources of medical records in comparable detail because the question of substance that emerges from the medical evidence in the case is the ALJ's rejection of Dr. Memet's opinion that Borgos-Hansen was disabled. The record clearly establishes Dr. Memet as plaintiff's primary treating physician during the two years prior to his hearing before the ALJ.[12]

**3.    The ALJ's Interpretation of the Medical Records**

The view the ALJ took of Borgos-Hansen's medical records, leading to the conclusion that plaintiff was not disabled, is summed up at Tr. 18 of the ALJ's decision:

> All medical opinions were carefully considered and weighed. The
> record does not contain any opinions from treating or examining

---

[12]   While the point is not determinative on this Ruling, I note that I cannot accept this statement by the ALJ at Tr. 16: "Although initially treating with Dr. [Kathleen] Sardegna, the record reveals that Dr. Anthony Cusano, M.D. [*sic*] has since managed the claimant's Lupus related treatment." Dr. Sardegna is a nephrologist. RR at 9. So is Dr. Cusano. Nephrologists became involved in Borgos-Hansen's care after an early lupus flare-up resulted in nephritis, a kidney condition. While Dr. Memet shared findings and medical evaluations with Dr. Cusano, whose concern with the health of Borgos-Hansen's kidneys continued, the contents of Dr. Memet's records set forth in text show that as a rheumatologist, Dr. Memet was the physician who during the two years prior to the administrative hearing "managed the claimant's Lupus related treatment" for the totality of that disease's many and varied manifestations.

> physicians which identify any objective medical findings to support
> a conclusion indicating that the claimant is disabled or has limitations
> greater than those determined in this decision.

What the ALJ is saying is that he "carefully considered and weighed" Dr. Memet's opinion, and "have accorded this opinion no weight." The question of substance presented by plaintiff's objections is the propriety of that decision.

## VI.   FURTHER DEVELOPMENT OF THE RECORD

I said *infra* that "Dr. Memet's records seem to demonstrate a worsening in the patient's lupus and its related complications": a qualified and tentative observation because a judge is not competent to express a medical opinion, and the Second Circuit cautions judges: "It is not our function to determine *de novo* whether [a plaintiff] is disabled." *Rosa*, 168 F.3d at 77. However, it is emphatically a function of a district judge to determine "if there are gaps in the administrative record" requiring remand to the Commissioner "for further development of the evidence." *Id*. at 82-83. This is such a case. The gap in the administrative record results from the ALJ's decision to reject a treating physician's opinion solely on the basis of what medical records say or do not say, without asking the physician to explain her opinion and the records' relation to that opinion. The case will be remanded for the further development of evidence relevant to that issue.

This is a quintessential case for a remand for further medical evidence. As we have seen, Dr. Memet formed an opinion over two years of examination and treatment that Borgos-Hansen was disabled . The ALJ rejected that opinion because, in his words, the medical records did not "identify any objective medical findings to support a conclusion indicating that the claimant is disabled." The ALJ's reasoning echoes that of the ALJ in *Rosa*, who rejected a treating physician's opinion of disability because the medical records did not include "findings of muscle spasm to corroborate any

loss of motion." That reasoning did not satisfy Judge Sotomayor, who wrote for the Second Circuit that "the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment." 168 F.3d at 79. Judge Cabranes expressed the same view in *Schaal*, where the ALJ rejected a treating physician's opinion of disability (expressed in answers to questionnaires) and was rebuked by the Second Circuit: "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson *sua sponte*." 134 F.3d at 505.

The court of appeals ordered remands in both *Rosa* and *Schaal*. I will do so in the case at bar. *Poupore v. Astrue,* 566 F.3d 303 (2d Cir. 2009), is not to the contrary. Judge Fitzsimmons cited *Poupore* in her RR at 44 for the proposition that "If the treating physician's opinion is not supported by objective medical evidence or is inconsistent with other substantial evidence in the record, the ALJ need not give the opinion significant weight." One cannot quarrel with that proposition, which is stated in the Regulations, 20 CFR § 404.1527(d)(2), but the facts in *Poupore* demonstrate its inapplicability to this case. The ALJ in *Poupore* discounted an opinion by one of the claimant's treating physicians, a Dr. Amir, which Dr. Amir expressed in these circumstances:

> Dr. Amir's September 2004 assessment that Poupore was limited to less than sedentary work was unsupported by any medical evidence. Dr. Amir did not support his conclusion with any clinical findings made in the course of his treatment, but rather relied upon the "evaluation by Dr. Black, orthopedics," as support for his assessment. However, as discussed above, Dr. Black's treatment notes do not support a conclusion that Poupore is entirely unable to perform even light, sedentary work. Thus, the ALJ did not err in according Dr. Amir's assessment with lesser weight.

566 F.3d at 307.

The case at bar is quite different. The opinion that Borgos-Hansen is disabled was expressed

by Dr. Memet during the course of her treatment of plaintiff over time, a disability resulting from conditions and symptoms upon which her answers to the questionnaires are based and fall within her medical specialty.  The medical records in the case are replete with findings and results, generated by Dr. Memet and by other physicians who have treated Borgos-Hansen or evaluated him for bureaucratic reasons.  Whether  the other medical records are so inconsistent with Dr. Memet's opinions as to preclude her opinions will be the subject of further proceedings before the SSA on remand.  I cannot reach such a conclusion as a matter of law on the present record.

Although he does not express it in such stark terms, ALJ Thomas is saying in his decision that  Dr. Memet's opinion on plaintiff's disability is not supported by (and by extension is contrary to) all the medical evidence in the case, including that evidence produced by Dr. Memet's own treatment.  The ALJ's conclusion may be correct.  It may be immune from challenge.  But the Court is not in a position to leave the ALJ's denial of disability benefits intact until a gap in the administrative record is filled.  That gap is the result of the ALJ's failure to ask Dr. Memet to explain her opinion in the light of the other medical evidence.  If on remand the inquiry is put to Dr. Memet, in words or substance, "Is your opinion that this patient is disabled supported by the medical records," she will presumably either say "yes" and explain why (with references to the record), or she will acknowledge that the records do not support and may even be contrary to her opinion, coupled with an explanation (if she is so minded) of why she adheres to her opinion nonetheless.

This further development of the record is necessary to place the Court in a position to decide whether the ALJ's decision denying benefits (if he adheres to it after remand) "is based upon legal error or is not supported by substantial evidence."  *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  Since Dr. Memet is a treating physician, the ALJ is required to evaluate her opinions in a

manner consistent with the Second Circuit's implementation of the treating physician rule, and I am not satisfied by the present record that he has done so. The remand in this case is for the purpose stated by the Second Circuit in *Schaal*, 134 F.3d at 505: "The proper course is to direct that this case be remanded to the SSA to allow the ALJ to reweigh the evidence pursuant to the 1991 Regulations, developing the record as may be needed."[13] That is what must be done in this case. The Court may rely upon the ALJ's fulfilling "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits," a duty inherent in "the essentially non-adversarial nature of the benefits proceeding." *Swiantek*, 588 Fed.Appx. at 83-84 (2d Cir. 2015).

On remand, the ALJ should further develop the record with particular reference to whether Borgos-Hansen's overall condition satisfies *either* of the two alternative Listings for systemic lupus erythematosus that appear in subsections (A) or (B) of Listing 14.02. *See, e.g.*, *Dowles v. Barnhart*, 258 F.Supp.2d 478, 487 (W.D.La. 2003) ("Since every physician to examine Dowles has found that Dowles has active SLE, Dowles meets the threshold requirement for Listing 14.02. The next step is to determine whether Dowles meets subsections (A) *or* (B) of Listing 14.02.") (emphasis added); *Vasquez v. Barnhart*, No. 02-cv-6751, 2004 WL 725322 (E.D.N.Y. March 2, 2004), at *8 ("On remand, the ALJ should address the criteria at both 14.00B1 and *both sections of 14.02*, and determine whether the plaintiff's impairment satisfies or is medically equivalent to these criteria.") (emphasis added).

## VII.   CONCLUSION

For the foregoing reasons, the Plaintiff's Objections to the Recommended Ruling of the

---

[13]   On remand the ALJ may conclude that the record should be further developed in ways additional to inquiries addressed to Dr. Memet.

Magistrate Judge are SUSTAINED in part and OVERRULED IN PART.  The Objections are Sustained  to the extent that the case will be remanded to the Defendant Commissioner.

As for the underlying case:

The motion of the Plaintiff for an order reversing or remanding the decision of the Defendant Commissioner is GRANTED IN PART and DENIED IN PART.  The motion is Granted to the extent that the Court remands this case to the Commissioner for further proceedings consistent with this Ruling.

The motion of the Defendant Commissioner for an order affirming the Commissioner's decision denying Plaintiff benefits is DENIED.

In consequence, the Recommended Ruling of the Magistrate Judge is REJECTED.

The Clerk is directed to close the case.

It is SO ORDERED.

Dated:   New Haven, Connecticut
          June 17, 2015


                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

38